WELLS FARGO BANK, NA v CHERRYLAND MALL
LIMITED PARTNERSHIP (ON REMAND)

Docket No. 304682. Submitted October 26, 2012, at Lansing. Decided
April 9, 2013, at 9:00 a.m.

Wells Fargo Bank, N.A., brought an action in the Grand Traverse
Circuit Court against Cherryland Mall Limited Partnership, David
Schostak (Schostak), and Schostak Brothers & Co., Inc., to recover
a deficiency owed under the terms of a mortgage. Cherryland had
obtained a commercial mortgage-backed securities (CMBS) loan,
using a mall it owned as collateral. Schostak was the guarantor of
the loan. The lender then transferred the loan and attendant loan
documents to Wells Fargo. After Cherryland's failure to make a
loan payment, Wells Fargo foreclosed on the property by advertise-
ment. Wells Fargo was the successful bidder at the foreclosure sale
with a bid of $6 million, which left a deficiency of roughly $2.1
million. Wells Fargo asserted that it was entitled to recover
damages in the amount of the loan deficiency from both Schostak
and Cherryland because Cherryland's insolvency constituted a
failure to maintain its single-purpose-entity status as required by
the loan documents. Wells Fargo moved for summary disposition
on multiple grounds. The court, Philip E. Rodgers, Jr., J., granted
Wells Fargo's motions in part, holding that as the guarantor on the
mortgage, Schostak was liable for the loan deficiency. In addition,
the court awarded attorney fees to Wells Fargo. Cherryland and
Schostak appealed. The Court of Appeals affirmed, concluding that
Cherryland's failure to remain solvent breached the covenant to
maintain its status as a single purpose entity and triggered the full
recourse provision of the mortgage. The Court determined that
any failure to remain solvent, regardless of the reason, was a
violation of the covenant. The Court, in response to the argument
that the contracts should not be enforced because they are against
public policy, noted that it was up to the Legislature to address
matters of public policy. *Wells Fargo Bank, NA v Cherryland Mall
Limited Partnership*, 295 Mich App 99 (2011). Defendants sought
leave to appeal in the Supreme Court. While the application was
pending, the Legislature passed the Nonrecourse Mortgage Loan
Act (NMLA), MCL 445.1591 *et seq.*, effective March 29, 2012,
which retroactively prohibits a postclosing solvency covenant from

being used as a nonrecourse carveout or as a basis for any claim against a borrower, guarantor, or other surety on a nonrecourse loan. On September 26, 2012, the Supreme Court, in lieu of granting leave to appeal, remanded the case to the Court of Appeals for reconsideration in light of the passage of the NMLA. *Wells Fargo Bank v Cherryland Mall Limited Partnership*, 493 Mich 859 (2012). On remand, the parties stipulated that the Attorney General could intervene in the action and the Court of Appeals granted the Attorney General's motion to intervene.

On remand, the Court of Appeals *held*:

1. To the extent that the provisions in the guarantee, which is one of the documents for a nonrecourse loan, purport to impose liability on Schostak as guarantor on the basis of the postclosing solvency covenant, they are invalid and unenforceable. The NMLA provides in MCL 445.1593(1) and (2) that a postclosing solvency covenant shall not be used, directly or indirectly, as a nonrecourse carveout or as the basis for any claim or action against any guarantor and that any provision in the documents for a nonrecourse loan that purports to use a nonrecourse carveout as the basis for a claim against a guarantor is invalid and unenforceable.

2. Whether a state statute violates the Contract Clause, US Const, art I, § 10, is determined by reference to a three-step inquiry. First, the court must determine whether the state law has operated as a substantial impairment of a contractual relationship. If it constitutes a substantial impairment, the court must look at whether the justification for the state law is based on a significant and legitimate public purpose. If a legitimate public purpose can be identified, the court looks at whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the adoption of the legislation. With respect to the third inquiry, as is customary in reviewing economic and social regulation, courts properly defer to legislative judgment regarding the necessity and reasonableness of a particular measure unless the state is one of the contracting parties.

3. There was a significant and legitimate public purpose for the NMLA. The remedy provided by the legislation is appropriate. Therefore, the Court of Appeals did not need to reach a conclusion on the substantial impairment question.

4. Although the NMLA will benefit Schostak, there is no evidence that the act was intended solely for his benefit.

5. That developers benefited when the Legislature, in enacting the NMLA, took action to stabilize the CMBS industry does not

undermine the NMLA because the purpose was not to benefit developers but to avert a broader economic problem of immense proportion in the interest of the public good. This was a legitimate public purpose that shows that the Legislature was properly exercising its police power by enacting the NMLA.

6. Although the NMLA invalidates the provisions in the loan documents that gave rise to plaintiff's entitlement to the deficiency, the remaining provisions of the lending documents remain in effect. Plaintiff failed to propose any lesser measure that could have accomplished the legislative objective. It is appropriate to conclude, in deference to the Legislature, that the Contract Clauses of the Michigan and United States Constitutions allow such legislation. Plaintiff is not entitled to the deficiency.

7. The right to substantive due process is violated when legislation is unreasonable and clearly arbitrary, having no substantial relationship to the health, safety, morals, and general welfare of the public. The retroactive aspects of economic legislation, as well as the prospective aspects, must meet the test of due process: a legitimate legislative purpose furthered by rational means. Michigan courts analyze whether a plaintiff's due process rights have been violated by determining whether the legislation bears a reasonable relation to a permissible legislative objective. Legislative acts adjusting the burdens and benefits of economic life come to a court with a presumption of constitutionality. The party challenging the legislation on due process grounds bears the burden of rebutting the presumption that there was a rational basis for the legislation. Where the legislative judgment is supported by any state of facts either known or which could reasonably be assumed, although such facts may be debatable, the judgment of the Legislature must be accepted. The means chosen by the Legislature to address the concerns about existing CMBS loans with postclosing solvency covenants, declaring the covenants invalid and unenforceable, were not arbitrary and rationally addressed the identified problem. There was no substantive due process violation.

8. When a new law makes it clear that it is retroactive, an appellate court must apply the law in reviewing judgments still on appeal that were rendered before the law was enacted and must alter the outcome accordingly.

9. The language of the stipulation the parties reached regarding the amount of damages, including costs, expenses, and attorney fees, that should be awarded should defendants lose on appeal is unambiguous. The parties agreed to an amount of $260,000 relative to the entire action and made no stipulation regarding the

amount due for any of the individual counts. The trial court erred by providing for an award of $260,000 in costs, expenses, and attorney fees when granting summary disposition with regard to count IV. Because there was no stipulation on that issue, the case must be remanded to the trial court for a determination whether plaintiff is entitled to costs, expenses, and attorney fees with respect to count IV.

Reversed and remanded.

1. MORTGAGES — NONRECOURSE MORTGAGE LOAN ACT.

The Nonrecourse Mortgage Loan Act applies to the enforcement and interpretation of all nonrecourse loan documents in existence on, or entered into on or after, March 29, 2012, the effective date of the act (MCL 445.1595).

2. CONSTITUTIONAL LAW — MORTGAGES — NONRECOURSE MORTGAGE LOAN ACT.

The Nonrecourse Mortgage Loan Act does not violate the Contract Clause or the Due Process Clause of the United States or Michigan Constitutions and does not violate the separation of powers doctrine contained in the Michigan Constitution (US Const, art I, § 10; US Const, Am XIV; Const 1963, art 1, §§ 10 and 17; Const 1963, art 3, § 2).

3. MORTGAGES — NONRECOURSE MORTGAGE LOAN ACT.

The Nonrecourse Mortgage Loan Act provides that a postclosing solvency covenant shall not be used, directly or indirectly, as a nonrecourse carveout or as the basis for any claim or action against any guarantor and that any provision in the documents for a nonrecourse loan that purports to use a nonrecourse carveout as the basis for a claim against a guarantor is invalid and unenforceable (MCL 445.1593[1] and [2]).

4. CONSTITUTIONAL LAW — CONTRACT CLAUSE — STATE STATUTES.

A three-step inquiry is employed in determining whether a state statute violates the Contract Clause; first, the court must determine whether the state law has operated as a substantial impairment of a contractual relationship; if it constitutes a substantial impairment, the court must look at whether the justification for the state law is based on a significant and legitimate public purpose; if a legitimate public purpose can be identified, the court must look at whether the adjustment of the rights and responsibilities of contracting parties is based on reasonable conditions and is of a character appropriate to the public purpose justifying the adoption of the legislation; with respect to the inquiry for the third

step, the court properly defers to the judgment of the Legislature regarding the necessity and reasonableness of a particular measure unless the state is one of the contracting parties (US Const, art I, § 10; Const 1963, art 1, § 10).

5. CONSTITUTIONAL LAW — MORTGAGES — NONRECOURSE MORTGAGE LOAN ACT.

The significant and legitimate public purpose of avoiding a broad and general economic problem of immense proportion supports the Legislature's exercise of its police power by enacting the Nonrecourse Mortgage Loan Act; the remedy provided by the act is appropriate (MCL 445.1591 *et seq.*).

6. CONSTITUTIONAL LAW — STATUTES — STATUTES AFFECTING ECONOMIC LIFE — PRESUMPTION OF CONSTITUTIONALITY.

Legislative acts adjusting the burdens and benefits of economic life come to the courts with a presumption of constitutionality; judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches if the legislation is supported by a legitimate legislative purpose furthered by rational means; a party challenging the legislation on due process grounds bears the burden of rebutting the presumption that there was a rational basis; the legislative judgment must be accepted when it is supported by any state of facts either known or which could reasonably be assumed, although such facts may be debatable.

7. STATUTES — RETROACTIVE STATUTES — APPLICATION TO JUDGMENTS ON APPEAL.

When a new law is clearly retroactive, an appellate court must apply the law in reviewing judgments still on appeal that were rendered before the law was enacted and must alter the outcome accordingly.

*Miller, Canfield, Paddock and Stone, P.L.C.* (by *Clifford W. Taylor, James L. Allen,* and *Dennis G. Bonucchi*), for plaintiff.

*Honigman Miller Schwartz and Cohn LLP* (by *John Pirich* and *I. W. Winsten*) for Cherryland Mall Limited Partnership and David Schostak.

*Bill Schuette,* Attorney General, *John J. Bursch,* Solicitor General, *Richard A. Bandstra,* Chief Legal Counsel, and *Christopher W. Braverman,* Assistant Attorney General, for the Attorney General.

Amici Curiae:

*Clark Hill PLC* (by *Paul S. Magy* and *Matthew W. Schlegel*) for the Building Owners and Managers Association International, Building Owners and Managers Association of Metro Detroit, Building Owners and Managers Association of Mid-Michigan, Building Owners and Managers Association West Michigan, Apartment Association of Michigan, and Construction Association of Michigan.

ON REMAND

Before: CAVANAGH, P.J., and SAWYER and METER, JJ.

PER CURIAM. This case is before us on remand from our Supreme Court for reconsideration of our prior decision in this matter in light of the Legislature's recent passage of the Nonrecourse Mortgage Loan Act, 2012 PA 67, MCL 445.1591 *et seq.* (the NMLA or Act 67). *Wells Fargo Bank v Cherryland Mall Ltd Partnership*, 493 Mich 859 (2012). On reconsideration, we reject plaintiff's constitutional challenges to the NMLA and hold that it bars plaintiff's claims.

I. FACTS AND PROCEDURAL HISTORY

The facts are set forth at length in our original opinion, *Wells Fargo Bank, NA v Cherryland Mall Ltd Partnership*, 295 Mich App 99; 812 NW2d 799 (2011). Briefly, defendant Cherryland Mall Limited Partnership secured an $8.7 million commercial mortgage-backed securities (CMBS) loan using a mall it owned as collateral. Defendant David Schostak signed a guaranty. Generally, CMBS financing involves the lender agreeing not to pursue recourse liability against the borrower or its owner; in return, the asset used as collateral, which

is known as "a single purpose entity," as well as money that flows from that asset, is isolated pursuant to "separateness covenants" and narrow limitations on the lender's agreement not to pursue recourse liability. These limitations set forth in "limited recourse provisions," are referred to as "recourse triggers" or "carveouts," and are generally related to "bad acts."

In this case, plaintiff ultimately commenced foreclosure by advertisement when defendant Cherryland failed to make a payment or payments. Plaintiff successfully bid $6 million, leaving a roughly $2.1 million deficiency. It sued defendants seeking to recover the deficiency. Relative to the deficiency, defendants appealed the trial court's holding that defendant Schostak, "as guarantor, was liable for the entire loan deficiency on the basis of the trial court's conclusion that insolvency was a violation of Cherryland's [single purpose entity] status . . . ." *Id.* at 107.

This Court affirmed, concluding that Cherryland's failure to remain solvent "breached the covenant to maintain its status as [a single purpose entity] and triggered the full recourse provision of the mortgage." *Id.* at 126. Paragraph 13 of the note provides:

> Notwithstanding anything to the contrary in this Note or any of the Loan Documents, . . . the Debt shall be fully recourse to Borrower in the event that . . . Borrower fails to maintain its status as a single purpose entity as required by, and in accordance with the terms and provisions of the Mortgage . . . . [*Id.* at 110.]

Paragraph 9 of the mortgage provides, in pertinent part:

> **Single Purpose Entity/Separateness**. Mortgagor covenants and agrees as follows:

* * *

(f) Mortgagor is and will remain solvent and Mortgagor will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due.

Defendant Schostak had signed a guaranty that included the following provision:

Notwithstanding anything to the contrary in the Note or any of the Loan Documents, . . . (B) Guarantor shall be liable for the full amount of the Debt and all obligations of Borrower to Lender under the Loan Documents in the event that: . . . (iii) Borrower fails to maintain its status as a single purpose entity as required by, and in accordance with the terms and provisions of the Mortgage . . . .

This Court concluded, consistent with the trial court, that ¶ 9(f) was a single purpose entity requirement and that insolvency was a violation of single purpose entity status. *Wells Fargo Bank, NA*, 295 Mich App at 114-125. Further, any failure to remain solvent, regardless of the reason, was a violation. *Id*. at 125.

This Court acknowledged the argument that its holding would "indicate economic disaster for the business community in Michigan," but concluded that its job was not "to save litigants from their bad bargains or their failure to read and understand the terms of a contract." *Id*. at 126. Moreover, in response to the argument that the contracts should not be enforced because they are against public policy, we noted that it was up to the Legislature to address matters of public policy. *Id*. at 127.

Defendants sought leave to appeal in the Supreme Court. While the application was pending, the Legislature passed the NMLA.

## II. THE NMLA

The NMLA applies "to the enforcement and interpretation of all nonrecourse loan documents in exist-

ence on, or entered into on or after, the effective date of [the NMLA]," which was immediately effective on March 29, 2012. MCL 445.1595. 2012 PA 67, enacting § 1, provides, in pertinent part:

> The legislature recognizes that the use of a post closing solvency covenant as a nonrecourse carveout, or an interpretation of any provision in a loan document that results in a determination that a post closing solvency covenant is a nonrecourse carveout, is inconsistent with this act and the nature of a nonrecourse loan; is an unfair and deceptive business practice and against public policy; and should not be enforced.

MCL 445.1593, the operative provision at issue, provides:

> (1) A post closing solvency covenant shall not be used, directly or indirectly, as a nonrecourse carveout or as the basis for any claim or action against a borrower or any guarantor or other surety on a nonrecourse loan.
>
> (2) A provision in the documents for a nonrecourse loan that does not comply with subsection (1) is invalid and unenforceable.

"Post closing solvency covenant" is defined as

> any provision of the loan documents for a nonrecourse loan, whether expressed as a covenant, representation, warranty, or default, that relates solely to the solvency of the borrower, including, without limitation, a provision requiring that the borrower maintain adequate capital or have the ability to pay its debts, with respect to any period of time after the date the loan is initially funded. The term does not include a covenant not to file a voluntary bankruptcy or other voluntary insolvency proceeding or not to collude in an involuntary proceeding. [MCL 445.1592(d).]

### III. ANALYSIS

Plaintiff argues that the NMLA did not invalidate the guaranty because in the guaranty defendant Schostak

relinquished his right to future defenses and waived any statutory rights regarding the invalidity, illegality, or unenforceability of the guaranty. Further, plaintiff argues that the NMLA violates: (1) the Contract Clauses of the United States and Michigan Constitutions, US Const, art I, § 10 and Const 1963, art 1, § 10, (2) the due process protections of US Const, Am XIV and Const 1963, art 1, § 17, and (3) the separation of powers doctrine, Const 1963, art 3, § 2. We conclude that the guaranty provisions are invalid and unenforceable under the NMLA and that the constitutional challenges to the act must fail.

### A. THE GUARANTY

Plaintiff argues that defendant Schostak agreed that his liabilities and obligations were "unconditional," "irrevocable," and "absolute" in §§ 1.1 and 1.3 of the guaranty. Further, Schostak relinquished his right to "any existing or future offset, claim or defense" in §§ 1.4 and 2.10 of the guaranty, including a defense based on any statutory right. In article II and § 2.4 of the guarantee, Schostak waived any statutory rights regarding the "invalidity, illegality or unenforceability of . . . any document or agreement executed in connection with the Guaranteed Obligations," agreeing that his obligations would not be "released, diminished, impaired, reduced or adversely affected" even if Cherryland had valid defenses. Assuming for purposes of analysis that these provisions would contractually bind defendant Schostak, we nonetheless conclude that they are invalid and unenforceable.

The guaranty is being invoked because, since it became insolvent, Cherryland "fail[ed] to maintain its status as a single purpose entity" as required by the mortgage. Again, MCL 445.1593(1) and (2) of the

NMLA provides that "[a] post closing solvency covenant shall not be used, *directly or indirectly*, as a nonrecourse carveout or as the basis for any claim or action against . . . any guarantor" and that any provision in the documents for a nonrecourse loan that purports to use a nonrecourse carveout as the basis for a claim against a guarantor "is invalid and unenforceable." (Emphasis added.) To the extent that provisions in the guaranty, which is one of the documents for a nonrecourse loan, purport to impose liability on defendant Schostak as guarantor on the basis of the postclosing solvency covenant, they are invalid and unenforceable.

## B. CONTRACT CLAUSES

Preliminarily, we note that " '[s]tatutes are presumed to be constitutional, and courts have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent.' " *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 490 Mich 295, 307; 806 NW2d 683 (2011), quoting *Taylor v Gate Pharm*, 468 Mich 1, 6; 658 NW2d 127 (2003). US Const, art I, § 10 states, in part: "No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility." Similarly, Const 1963, art 1, § 10 provides: "No bill of attainder, ex post facto law or law impairing the obligation of contract shall be enacted." The "state constitutional provision is not interpreted more expansively than its federal counterpart." *Attorney General v Michigan Pub Serv Comm*, 249 Mich App 424, 434; 642 NW2d 691 (2002); see also *AFT Mich v Michigan*, 297 Mich App 597, 609; 825 NW2d 595 (2012) ("the two provisions are interpreted similarly"). "It has been said that the purpose of the Contract Clause is to protect bargains reached by

parties by prohibiting states from enacting laws that interfere with preexisting contractual arrangements." *In re Certified Question*, 447 Mich 765, 777; 527 NW2d 468 (1994).

In arguing that the NMLA is an unconstitutional impairment of contract, plaintiff relies primarily on *Sturges v Crowninshield*, 17 US (4 Wheat) 122, 199-201; 4 L Ed 529 (1819), and *Walker v Whitehead*, 83 US (16 Wall) 314, 318; 21 L Ed 357 (1873), which held that states could change a remedy if no substantial contract rights were impaired but could not discharge the obligations of a debtor. However, in *Blue Cross & Blue Shield of Mich v Governor*, 422 Mich 1; 367 NW2d 1 (1985), the Court recognized that there has been a movement away from this absolute bar to contract impairment. The Court stated, *id.* at 20:

> Beginning with the landmark case of *Home Building & Loan Ass'n v Blaisdell*, 290 US 398; 54 S Ct 231; 78 L Ed 413 (1934), the modern United States Supreme Court has construed the Contract Clause as not prohibiting a state from exercising its police power to abrogate private or public contracts if reasonably related to remedying a social or economic need of the community. Under modern Contract Clause analysis, a balancing approach has been adopted by the courts, weighing the degree of the impairment of the contractual rights and obligations of the parties against the justification for the impairment as an act of the state's police power to implement legislation for a legitimate public purpose. Michigan courts have followed this lead. See *Van Slooten v Larsen*, 410 Mich 21; 299 NW2d 704 (1980) (see in particular Justice LEVIN's dissenting opinion); *Metropolitan Funeral System Ass'n v Ins Comm'r*, 331 Mich 185, 194 *ff.*; 49 NW2d 131 (1951), and federal cases cited therein.

Plaintiff maintains that the balancing test applies only to retroactive state laws that "impair contractual obligations not involving the impairment of debts," and

that *Sturges* and *Walker* still control when the issue is debt relief. However, in *Keystone Bituminous Coal Ass'n v DeBenedictis*, 480 US 470, 503; 107 S Ct 1232; 94 L Ed 2d 472 (1987), the Court noted that, while the primary focus of the Contract Clause was "pre-existing debtor-creditor relationships that obligors were unable to satisfy," "[e]ven in such cases, the Court has refused to give the Clause a literal reading." Currently, whether a state statute violates the Contract Clause is determined by reference to a three-step inquiry set forth in *Energy Reserves Group, Inc v Kansas Power & Light Co*, 459 US 400; 103 S Ct 697; 74 L Ed 2d 569 (1983).[1] First, courts must determine whether the state law has operated as a substantial impairment of a contractual relationship. *Id.* at 411. If it constitutes a substantial impairment, the court must look at whether the justification for the state law is based on a significant and legitimate public purpose. *Id.* at 411-412. If a legitimate public purpose can be identified, the court looks at whether the adjustment of " 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.' " *Id.* at 412, quoting *United States Trust Co of New York v New Jersey*, 431 US 1, 22; 97 S Ct 1505; 52 L Ed 2d 92 (1977). With respect to this third inquiry, " '[as] is customary in reviewing economic and social regulation, . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure' " unless the state is one of the contracting

---

[1] See also *In re Certified Question*, 447 Mich at 777. Plaintiff maintains that the obligations at issue in *Energy Reserves Group, Inc*, did not involve the impairment of debts but, in setting forth the framework for analysis of Contract Clause issues, the Court did not qualify application on the basis of the nature of the contract right impaired.

parties. *Energy Reserves Group, Inc*, 459 US at 412-413, quoting *United States Trust Co of New York*, 431 US at 22-23.

### 1. SUBSTANTIAL IMPAIRMENT

Defendants assert that the original parties to the CMBS loan at issue understood and intended at the time of contracting that the loan would be nonrecourse in the event of insolvency. In *Energy Reserves Group, Inc*, 459 US at 411, the Court noted that "state regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment." However, despite indications that this may have been the original parties' intent, this Court previously concluded that "the mortgage, as incorporated into the note, unambiguously required Cherryland to remain solvent in order to maintain its [single purpose entity] status." *Wells Fargo Bank, NA*, 295 Mich App at 128. Moreover, defendant Schostak unambiguously agreed that he would "be liable for the full amount of the Debt and all obligations of Borrower to Lender under the Loan Documents" if Cherryland failed "to maintain its status as a single purpose entity as required by, and in accordance with the terms and provisions of the Mortgage . . . ." We question the sufficiency of the evidence to summarily state that plaintiff's reasonable expectation, despite unambiguous contract language to the contrary, was that the loan would remain nonrecourse in the event of insolvency. Moreover, we note the absence of guidance on whether the assignee's reliance on the contract would give way to the original parties' intent for purposes of discerning whether there has been a substantial impairment within the meaning of the Contract Clause. However, for the reasons that follow we conclude that there was a significant and legitimate public purpose for the NMLA and that the

remedy provided by the legislation was appropriate. Accordingly, we need not reach a conclusion on the substantial impairment question.

## 2. SIGNIFICANT AND LEGITIMATE PUBLIC PURPOSE

On February 29, 2012, there was a meeting of the Senate Economic Development Committee at which Senate Bill 992, the precursor to the NMLA, was discussed.[2] At the meeting, it was represented that the original opinion in this case had changed the nature of nonrecourse mortgage loans. It was also represented that: (1) the proposed act would "set the course where it was intended to be," (2) allowing nonrecourse loans to become recourse due to insolvency "would irreparably harm the, the current environment for investment in Michigan," (3) the legislation would maintain the status quo, and (4) the failure to pass the proposed act "would basically eliminate nonrecourse loans in Michigan," leading to a collapse of nonrecourse lending, a decrease in tax revenues, and "a major foreclosure issue." Transcript of hearing on SB 992, Senate Economic Development Committee (February 29, 2012), pp 5, 8, 12, 18-19. Further, a commercial mortgage banking firm representative testified that over 50 percent of its $2.8 billion in current nonrecourse loans could qualify as insolvent, making loans recourse, which would be catastrophic. *Id.* at 19.

Plaintiff characterizes this reaction and defendants' representations as the " 'Sky is Falling' Hyperbole."

---

[2] The minutes of the February 29, 2012, committee meeting can be found at <http://www.senate.michigan.gov/committees/Default.aspx?commid=50>. The minutes indicate that there was an audio recording of the meeting "available upon request for a minimum fee." Defendants have provided an unofficial transcript of the meeting. Plaintiff has not raised any issue regarding the accuracy of this transcript.

Plaintiff asserts that not all nonrecourse loans have non-recourse carveouts for insolvency, and that defendants "have manufactured this trumped-up industry crisis" "to rescue [defendant] Schostak." However, as noted in the original opinion in this case, " 'the Legislature possesses superior tools and means for gathering facts, data, and opinion and assessing the will of the public.' " *Wells Fargo Bank, NA*, 295 Mich App at 127, quoting *Woodman v Kera LLC*, 486 Mich 228, 246; 785 NW2d 1 (2010) (opinion by YOUNG, J.). Moreover, while the NMLA will benefit defendant Schostak, we have found no evidence that the act was intended solely for his benefit.

At the hearing before the Senate Economic Development Committee, there was no quantification of the actual number of CMBS loans that might have language making a loan recourse in the event of insolvency. However, the testimony suggested that the affected loans would by no means be limited to those currently involved in litigation. For example, developers testified that they would be unable to get necessary financing for continued development because, when applying for financing, they would have to list contingent liabilities based on potential deficiencies arising from postclosing solvency covenants. Transcript of Hearing on SB 992, Senate Economic Development Committee (February 29, 2012), pp 12, 14, 18. Moreover, Senator Arlan Meekhof, who sponsored the bill, testified:

> Many of the loans that are existing, that have already been written, even if they change the language in the future in nonrecourse loans will make many of the borrowers unfinanceable because there will be a concern by the lenders that there would be a stringing liability that was never expected on their financial statement. [*Id.* at 10.]

Further, there was testimony indicating that loan documents for CMBS loans were standardized and routinely

included the problematic language. Given this testimony, there is no support for plaintiff's contention that the loans affected by this legislation were relatively limited. We have no reason to question the representations that there will be a collapse of nonrecourse lending in Michigan if CMBS loans routinely become recourse and that tax revenues, as well as foreclosures, will be affected. And we note that *Energy Reserves Group, Inc*, 459 US at 412, identifies "remedying of a broad and general social or economic problem" as a "significant and legitimate public purpose . . . ."

Nonetheless, *Energy Reserves Group, Inc*, also indicates that "[t]he requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Id*. This legislation benefits defendant Schostak. Plaintiff suggests that defendant Schostak used political influence to get the legislation passed for his individual advantage.[3] If true, this would militate in favor of a finding that the bill was intended to benefit special interests. However, the testimony before the Senate Economic Development Committee suggests that the legislation would have far greater impact than just benefiting defendant Schostak.[4]

---

[3] Plaintiff represents that defendant David Schostak is cochief executive officer of defendant Schostak Brothers & Co., Inc., and that Robert Schostak is cochairman and cochief executive officer. Plaintiff further represents that Robert Schostak is "a high ranking Republican Party leader in Michigan, with many years of involvement in assisting the party's candidates to gain election in the legislature." We note that Robert Schostak has been chairman of the Michigan Republican Party since January 2011, was finance chairman through the 2010 election cycle, and has served on campaign fundraising teams for prominent Republicans. See <http://www.migop.org/index.php/about/party-leadership/>.

[4] It is noteworthy that the legislation was opposed in the Senate by five senators: two (of 12) democrats and three (of 26) republicans. 2012 Journal of the Senate 23 (March 7, 2012), p 321. In the House, it was

The legislation does benefit commercial developers generally, a group that would constitute a "special interest." However, it appears that the Legislature was motivated by a broad and general economic problem, one alluded to in our prior opinion:

> We recognize that our interpretation seems incongruent with the perceived nature of a nonrecourse debt and are cognizant of the amici curiae's arguments and calculations that, if accurate, indicate economic disaster for the business community in Michigan . . . . [*Wells Fargo Bank, NA,* 295 Mich App at 126.]

That developers benefited when the Legislature took action to stabilize the CMBS industry will not undermine the legislation because the purpose was not to benefit developers but to avert a broader economic problem of immense proportion in the interest of the public good. This was a legitimate public purpose that shows that the Legislature was properly exercising its police power.

### 3. REASONABLE AND APPROPRIATE CONDITIONS

In *Energy Reserves Group, Inc*, the Supreme Court held that " 'courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure' " when the contract is between private parties. *Energy Reserves Group, Inc*, 459 US at 412-413 (citation omitted); see also *Keystone Bituminous Coal Ass'n*, 480 US at 504-505. In the present case, the concern was that economic development in this market would significantly diminish because lenders would not extend loans to those commercial developers with contingent liabilities arising from

---

passed by 97 votes to 12 votes; the nays were from 10 republicans and two democrats. 2012 Journal of the House 29 (March 20, 2012), p 427. The legislation had bipartisan support.

existing CMBS loans with the provision allowing them to become recourse in the event of insolvency. The legislation in effect erased the concern by making the provision invalid and unenforceable. The holding in *Energy Reserves Group, Inc*, included that the adjustment to " 'the rights and responsibilities of contracting parties [must be based] upon reasonable conditions and [be] of a character appropriate to the public purpose justifying [the legislation's] adoption.' " *Energy Reserves Group, Inc*, 459 US at 412, quoting *United States Trust Co of New York*, 431 US at 22. While this measure invalidates the provisions that gave rise to plaintiff's entitlement to the deficiency, we note that the remaining provisions of the lending documents remain in effect. Plaintiff has not proposed any lesser measure that could have accomplished the legislative objective. Thus, in deference to the Legislature, we conclude that the Contract Clauses allow for such legislation.

## C. SUBSTANTIVE DUE PROCESS

The Fourteenth Amendment of the United States Constitution states that no "State [shall] deprive any person of life, liberty, or property, without due process of law . . . ." Similarly, Const 1963, art 1, § 17 provides that no person shall "be deprived of life, liberty or property, without due process of law."

> [A]lthough the text of the Due Process Clauses provides only procedural protections, due process also has a substantive component that protects individual liberty and property interests from arbitrary government actions regardless of the fairness of any implementing procedures. . . . The right to substantive due process is violated when legislation is unreasonable and clearly arbitrary, having no substantial relationship to the health, safety,

morals, and general welfare of the public. [*Bonner v City of Brighton*, 298 Mich App 693, 705-706; 828 NW2d 408 (2012).[5]

In *Gen Motors Corp v Romein*, 503 US 181; 112 S Ct 1105; 117 L Ed 2d 328 (1992), the Court stated: "Retroactive legislation presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions. For this reason '[t]he retroactive aspects of [economic] legislation, as well as the prospective aspects, must meet the test of due process': a legitimate legislative purpose furthered by rational means." *Id.* at 191, quoting *Pension Benefit Guaranty Corp v R A Gray & Co*, 467 US 717, 730; 104 S Ct 2709; 81 L Ed 2d 601 (1984). Similarly, Michigan Courts "analyze whether a plaintiff's due process rights have been violated [by determining] 'whether the legislation bears a reasonable relation to a permissible legislative objective.' " *Phillips v Mirac, Inc*, 470 Mich 415, 436; 685 NW2d 174 (2004), quoting *Detroit v Qualls*, 434 Mich 340, 366-367 n 49; 454 NW2d 374 (1990). In *Kentucky Div, Horsemen's Benevolent & Protective Ass'n, Inc v Turfway Park Racing Ass'n, Inc*, 20 F3d 1406, 1414 (CA 6, 1994), the court stated:

> Because "legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality," *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 49 L. Ed. 2d 752, 96 S. Ct. 2882 (1976), "judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches," *Pension Benefit Guaranty Corp.* [, 467 US

---

[5] When a state law is challenged on substantive due process grounds, the plaintiff need not demonstrate a deprivation of a liberty or property interest. See *American Express Travel Related Servs Co, Inc v Kentucky*, 641 F3d 685, 688-689 (CA 6, 2011).

at 729], if the "statute is supported by a legitimate legislative purpose furthered by rational means." *Id.* In fact, Congress has "absolutely no obligation to select the scheme that a court later would find to be the fairest, but simply one that was rational and not arbitrary." *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.Co.*, 470 U.S. 451, 477, 84 L. Ed. 2d 432, 105 S. Ct. 1441 (1985).

The party challenging the legislation on due process grounds bears the burden of rebutting the presumption that there was a rational basis. *Qualls*, 434 Mich at 366. Moreover, " 'where the legislative judgment *is supported by "any state of facts either known or which could reasonably be assumed,"* although such facts may be "debatable," the legislative judgment must be accepted. *Carolene Products Co v Thompson*, 276 Mich 172, 178; 267 NW 608 (1936).' " *Qualls*, 434 Mich at 366, quoting *Shavers v Attorney General*, 402 Mich 554, 614; 267 NW2d 72 (1978). Stated more emphatically:

> [T]he party challenging a legislative enactment subject to rational basis review must " 'negative every conceivable basis which might support it.' " *See, e.g., Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S. Ct. 1001, 35 L. Ed. 2d 351 (1973) (quoting *Madden v. Kentucky*, 309 U.S. 83, 88, 60 S. Ct. 406, 84 L. Ed. 590 (1940)). "Under rational basis review, it is 'constitutionally irrelevant [what] reasoning in fact underlay the legislative decision.' " *Craigmiles [ v Giles*, 312 F3d 220, 224 (CA 6, 2002)] (alteration in original) (quoting *R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179, 101 S. Ct. 453, 66 L. Ed. 2d 368 (1980)). "[W]e will be satisfied with the government's 'rational speculation' linking the regulation to a legitimate purpose, even 'unsupported by evidence or empirical data.' " *Id.* (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993)). Thus, if a statute can be upheld under any plausible justification offered by the state, or even hypothesized by the court, it survives rational-basis scrutiny. *See Berger [ v City of Mayfield Heights*, 154 F3d 621, 624-626 (CA 6, 1998)] (speculating as

to the City Council's possible motivations for passing the challenged ordinance). [*American Express Travel Related Servs Co, Inc v Kentucky*, 641 F3d 685, 690 (CA 6, 2011).]

Here, there were concerns that existing CMBS loans with postclosing solvency covenants would result in commercial developers not qualifying for financing to pursue continued economic development in Michigan, that tax revenues would be affected, and that foreclosures would increase, all during a period of economic recovery in this state. The means chosen to address these concerns, declaring the covenants invalid and unenforceable, were not arbitrary. Rather, they rationally addressed the identified problem. There was no substantive due process violation.

### D. SEPARATION OF POWERS

Plaintiff argues that the NMLA violates the Separation of Powers Clause, Const 1963, art 3, § 2, by depriving this Court of its exclusive power to interpret and enforce the contract in the case pending before it. Const 1963, art 3, § 2 states that "[t]he powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." In *Kyser v Kasson Twp*, 486 Mich 514, 535; 786 NW2d 543 (2010) (finding that the judiciary had interfered with the legislative zoning powers of a township), the Court quoted *Massachusetts v Mellon*, 262 US 447, 488; 43 S Ct 597; 67 L Ed 1078 (1923), explaining that

"[t]he functions of government under our system are apportioned. To the legislative department has been committed the duty of making laws; to the executive the duty of executing them; and to the judiciary the duty of interpreting and applying them in cases properly brought before

the courts. The general rule is that neither department may invade the province of the other and neither may control, direct or restrain the action of the other."

In *Detroit Mayor v Arms Technology, Inc*, 258 Mich App 48; 669 NW2d 845 (2003), the plaintiffs brought public nuisance and negligence actions against the defendants relative to the marketing and distribution of firearms. The trial court dismissed the negligence claims, but held that the nuisance claims were viable and that MCL 123.1102, which prohibits local regulation of firearms, did not prohibit the plaintiffs' claims. While the actions were pending, the Legislature passed MCL 28.435, subsection (9) of which reserved the bringing of such actions to the state and expressly barred a political subdivision from bringing such an action. Further, subsection (13) provided:

> Subsections (9) through (11) are intended only to clarify the current status of the law in this state, are remedial in nature, and, therefore, apply to a civil action pending on the effective date of this act.

This Court held:

> At its core, plaintiffs' separation-of-powers challenge hinges on the fact that the enactment of MCL 28.435(9)-(13) effectively overrides the trial court's finding that plaintiffs are not prohibited by MCL 123.1102 from bringing this action. Plaintiffs vigorously assert that this statutory enactment "overturns a judicial decision" or, alternatively, "seeks to compel a judicial decision in favor of defendants." We find plaintiffs' arguments to be misplaced.
>
> First, we note that the trial court's ruling regarding MCL 123.1102 did not constitute a final judgment because it did not dispose of all claims and adjudicate all the rights and liabilities of the parties. MCR 7.202(7)(a)(i); *Allied Electric Supply Co, Inc v Tenaglia*, 461 Mich 285, 288; 602 NW2d 572 (1999). Because the trial court's order was not a final judgment that the statute required to be reopened,

the order was subject to revision by the Legislature[.] [*Detroit Mayor*, 258 Mich App at 65.]

Quoting *Plaut v Spendthrift Farm, Inc*, 514 US 211, 226-227; 115 S Ct 1447; 131 L Ed 2d 328 (1995), the Court explained:

"Congress can always revise the judgments of Article III courts in one sense: When a new law makes clear that it is retroactive, an appellate court must apply that law in reviewing judgments still on appeal that were rendered before the law was enacted, and must alter the outcome accordingly. See *United States v. Schooner Peggy*, 5 U.S. 103, 1 Cranch 103, 2 L. Ed. 49 (1801); *Landgraf v. USI Film Products*, 511 U.S. 244, 273-280, 128 L. Ed. 2d 229, 114 S. Ct. 1483 (1994). . . . [A] distinction between judgments from which all appeals have been foregone or completed, and judgments that remain on appeal (or subject to being appealed), is implicit in what Article III creates: not a batch of unconnected courts, but a judicial *department* composed of 'inferior Courts' and 'one supreme Court.' Within that hierarchy, the decision of an inferior court is not (unless the time for appeal has expired) the final word of the department as a whole. It is the obligation of the last court in the hierarchy that rules on the case to give effect to Congress's latest enactment, even when that has the effect of overturning the judgment of an inferior court, since each court, at every level, must 'decide according to existing laws.' *Schooner Peggy, supra*, at 109." [*Detroit Mayor*, 258 Mich App at 65-66.]

This Court concluded, *id*. at 66,

consistent with the principles articulated in *Plaut*, that plaintiffs cannot show that the enactment of MCL 28.435 violates the Michigan Constitution simply because it was enacted after the trial court ruled on the applicability of MCL 123.1102.

Plaintiff suggests that *Plaut* is inapplicable because it involved Article III federal courts. However, *Detroit Mayor* indicates that a state court would be required to

apply retroactive legislation to a pending case as long as the appeal process is ongoing.

Plaintiff also argues that, to the extent that the Legislature can pass retroactive legislation clarifying a law it previously enacted, it cannot retroactively interpret a private contract it had no role in drafting. Plaintiff points out that defendants have cited no cases "in which a Michigan court blessed a statute directing the outcome of an appeal of a judgment enforcing a private contract right." However, the legislation does not "interpret" the contract or direct this Court or any court to do anything. It declares that the postclosing solvency covenant is invalid, unenforceable, and against public policy. This may have the effect of invalidating plaintiff's entitlements based on the contract, but if so it will be because the courts apply the new law, not because the Legislature has directly dictated the outcome in this case.

## IV. ATTORNEY FEES AND COSTS

The parties reached a stipulation regarding the amount of damages should defendants lose on appeal. The stipulation provided for a $260,000 award for costs and expenses, including attorney fees, but defendants claimed that they agreed to pay this amount only if plaintiff prevailed on the claim for the roughly $2.1 million deficiency. The trial court agreed with plaintiff that, pursuant to the stipulation, plaintiff was entitled to the award of $260,000 on the basis of the success with "Motion No. 4"; this motion dealt with an entitlement to $61,958 from defendant Schostak for a misapplication of rents. In the original opinion in this case, we determined that it was unnecessary to address this issue because we held that plaintiff was entitled to the deficiency. Because we have concluded on remand that

plaintiff is not entitled to the deficiency, we must now reach the merits of this issue.

"A 'stipulation,' . . . is an agreement, admission, or concession made in a judicial proceeding by the parties or their attorneys, respecting some matter incident thereto. Its purpose is generally stated to be the avoidance of delay, trouble, and expense." [*Eaton Co Bd of Co Rd Comm'rs v Schultz*, 205 Mich App 371, 378-379; 521 NW2d 847 (1994), quoting 73 Am Jur 2d, Stipulations, § 1, p 536.]

"Stipulated orders that are accepted by the trial court are generally construed under the same rules of construction as contracts." *Phillips v Jordan*, 241 Mich App 17, 21; 614 NW2d 183 (2000). " '[W]hen parties have freely established their mutual rights and obligations through the formation of unambiguous contracts, the law requires this Court to enforce the terms and conditions contained in such contracts, if the contract is not "contrary to public policy." ' " *Holmes v Holmes*, 281 Mich App 575, 594; 760 NW2d 300 (2008), quoting *Bloomfield Estates Improvement Ass'n, Inc v Birmingham*, 479 Mich 206, 213; 737 NW2d 670 (2007). "A contract must be interpreted according to its plain and ordinary meaning." *Holmes*, 281 Mich App at 593.

"Under ordinary contract principles, if contractual language is clear, construction of the contract is a question of law for the court. If the contract is subject to two reasonable interpretations, factual development is necessary to determine the intent of the parties and summary disposition is therefore inappropriate. If the contract, although inartfully worded or clumsily arranged, fairly admits of but one interpretation, it is not ambiguous. The language of a contract should be given its ordinary and plain meaning." [*Id.* at 594, quoting *Meagher v Wayne State Univ*, 222 Mich App 700, 721-722; 565 NW2d 401 (1997) (citations omitted).]

In this case, the stipulation was placed on the record. The first paragraph established the deficiency amount as being $2,142,697.86 and provided "that the sum of $260,000 is the reasonable amount of legal costs and expenses, including reasonable attorneys fees in prosecuting this action through the date of entry of the judgment only." The next paragraph established that judgment on count I would be entered against defendant Cherryland in the same amount as against the guarantor and summarized the dispositions of counts II through V, including the disposition of count IV regarding the "assignment of rents." Paragraph 3 addressed the disposition of count VI and in ¶ 4, there was an agreement "not to make any claims to the receiver for recovery of any or all portion of the fees ordered to be disgorged under motion Number 5 ruled by the Court" and that "this amount shall be credited against the judgment upon payment."

Considering the stipulation in its entirety, we conclude that the language is unambiguous. The parties agreed to an amount of $260,000 relative to the entire action and made no stipulation regarding the amount due for any of the individual counts. Indeed, the issue of costs, expenses, and attorney fees was addressed at the outset before any of the individual counts were mentioned. There is simply nothing in this stipulation that indicates an agreement to $260,000 in costs, expenses, and attorney fees for count IV. Consequently, the trial court erred by providing for an award of $260,000 in costs, expenses, and attorney fees in the order granting summary disposition with regard to count IV. Because there was no stipulation on that issue, we remand for a determination whether plaintiff is entitled to costs, expenses, and attorney fees with respect to count IV.

Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

CAVANAGH, P.J., and SAWYER and METER, JJ., concurred.