*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DEPARTMENT OF NATURAL RESOURCES,

        Plaintiff-Appellee,

v

WISCONSIN ELECTRIC POWER COMPANY
doing business as WE ENERGIES, and
WISCONSIN ELECTRIC COMPANY,

        Defendants-Appellants.

UNPUBLISHED
July 20, 2023

No. 360932
Ingham Circuit Court
LC No. 21-000614-CK

Before: GLEICHER, C.J., and O'BRIEN and MALDONADO, JJ.

PER CURIAM.

In the early days of this lawsuit, defendants unsuccessfully challenged venue and the facial sufficiency of the complaint. The trial court denied both motions, and we granted defendants' application for leave to appeal. We now affirm, holding that the attorney general was permitted by statute to file suit in her selected venue, and that summary disposition under MCR 2.116(C)(8) is reserved for those cases in which no factual development could support the claims. This is not such a case.

## I. BACKGROUND

Securing permission to construct dams and hydroelectric power plants along waterways is a long and complicated process. In a "trail-blazing" transaction, the defendant power companies brought together a host of federal, state, local, and nongovernmental agencies interested in the Menominee River Basin, which flows through northern Wisconsin and the Upper Peninsula.[1]

---

[1] The parties to the negotiation were Wisconsin Electric (WE), Michigan Department of Natural Resources (MDNR), Michigan Department of Environmental Quality (MDEQ), Michigan Attorney General, Wisconsin Department of Natural Resources (WDNR), Wisconsin Department of Administration, U.S. Fish and Wildlife Service (USFWS), National Park Service (NPS), Michigan Hydro Relicensing Coalition, and River Alliance of Wisconsin.

Powell, *A Case Study for Stakeholders: An Alternative to Traditional Hydroelectric Relicensing*, 18 Energy L J 405, 410 (1997).  After nearly three years of negotiations in the 1990s, the parties entered the Wilderness Shores Settlement Agreement (WSSA).  Agreement in hand, defendants secured licensing from the Federal Energy Regulatory Commission (FERC) without delays or additional costs.

Certain parties to the agreement were particularly interested in the removal of three existing dams from the river.  At issue in this case is the removal of the Pine Dam located in Wisconsin.  Relevant to that decommission project, the WSSA provides:[2]

> 8.3    Pine Project (FERC No. 2486)
>
> Wisconsin Electric [WE] agrees to remove the Pine Project upon the end of the current license period provided that the Resource Agencies[3] continue to support removal.  The following process shall be used:
>
> a)  in Year 25 of the current license term (Year 2020), WE will begin consultation with the Resource Agencies for the purpose of affirming or modifying the surrender decision to include the removal decision and/or date of the Pine Project removal;
>
> b)  the surrender application will be developed in accordance with the provisions of Section 8.4[];
>
> c)  WE shall file a surrender application with FERC proposing that the Pine Project be removed at the end of the current license period (Year 2025); and
>
> d)  WE shall remove the project according to the schedule and plan approved by FERC.
>
> 8.4    Dam Removal Process
>
> [WE] shall prepare surrender applications for the Sturgeon and Pine Projects that define the extent of the project removal.  To develop the surrender application, WE shall:
>
> a)  select a consultant, as necessary, in consultation with the Team to study removal alternatives;
>
> b)  prepare a draft report containing alternatives and cost estimates which is provided to the Team for a 90 day review and input period;

---

[2] The "Pine Project" is the Pine Dam.

[3] The Resource Agencies are the WDNR, MDNR, MDEQ, USFWS, and NPS.

c) prepare a final report that identifies the selected alternative for filing with FERC for approval;

d) obtain necessary permits from the Resource Agencies with assistance from the state and federal resource agencies;

e) remove the projects, as ordered by FERC; and

f) retain the decision authority within the removal process.

These provisions require defendants "to prepare [a] surrender application[]" to remove the Pine Dam and submit the application to the FERC. The application was to be developed "provided that the Resource Agencies continue to support removal."

The WSSA also required the formation of an "implementation team" comprised of the resource agencies to "coordinate and implement the Settlement." Pursuant to the WSSA, bylaws were enacted to govern the implementation team. These bylaws require defendants to consult with the team before making a submission to the FERC. Decisions must be made by "[c]onsensus," which is defined by Bylaws § 18.E as "reaching a common agreement among all [team] regular members which, while it may not be the first choice of any or all members, is a decision that can be supported by all [team] regular members."

The MDNR alleged that defendants did not consult with all the resource agencies to determine whether each continued to support removal of the Pine Dam. Instead, defendants met with the WDNR, which, defendants alleged, no longer supported removal of the dam. On May 5, 2021, MDNR and the Michigan Department of Environment, Great Lakes, and Energy (MDEGLE)[4] sent defendants a letter asking them to schedule a team meeting on this issue. Defendants scheduled a meeting for June 1 and "[r]epresentatives of every Resource Agency" attended. According to MDNR, "every Resource Agency confirmed that it continued to support removal of the Pine Dam." MDNR alleged that "[d]efendants acknowledged the Resource Agencies' positions but refused to move to the next step" toward removing the dam. Defendants believed that because one resource agency—WDNR—allegedly no longer wanted the dam removed, they were not required to plan to remove it.

## A. FERC PROCEEDINGS

Defendants unilaterally proceeded before the FERC seeking to "extend [their] license for the Pine Dam to 2040." The resource agencies all filed objections. In a split opinion before a panel of three commissioners, the FERC granted the motion to extend the license for the Pine Dam until 2040. *Wisconsin Electric Power Co*, 173 FERC P61,162 (2020).

In their FERC application, defendants claimed that they had "consulted with the Resource Agencies in 2016 through 2018, and that the Resource Agencies agreed to support a 15-year license

---

[4] The Michigan department responsible for environmental concerns changed names and several times in the past few years. It is not important to this appeal to outline those changes.

extension." *Id*. The MDNR describes this allegation of comprehensive consultation as a misrepresentation, asserting that defendants met only with the WDNR, and only once in 2016. Following public notice of defendants' FERC application, several interested parties filed motions to intervene, including NPS, USFWS, WDNR, MDNR, and MDEGLE. *Id*. at P62162. The FERC majority acknowledged the intervenors' position "that a consensus among the Resource Agencies on whether to surrender the Pine Project in 2025 has not yet been reached and that extending the license term for the project would interfere with that process." *Id*. Indeed, the NPS disputed "that the Resource Agencies agreed to a 15-year license extension," and the MDNR "assert[ed] that it continues to support surrender of the Pine Project." *Id*.

The FERC majority found the license extension "reasonable" because it would permit the commission to consider several projects affecting the river at one time, rather than piecemeal. *Id*. at P62163. The majority continued:

> With regard to whether a license extension would violate the WSSA, the parties to that agreement did not ask the [FERC] to approve it and, indeed, the [FERC] specifically noted, in relicensing a separate project subject to the WSSA, that the question of the Pine Project's future was not before it. [WE] has expressed the intent to relicense the project, and, for the reasons discussed above, extending the license term in order to coordinate the relicensing of the projects in the upper Menominee River Basin is warranted. To the extent that parties to the WSSA believe that [WE's] request to extend the Pine Project's license term violates that agreement, *they may seek relief in a court of appropriate jurisdiction*, as provided in section 2.3.4 of the WSSA[5] . . . . [*Id*. (emphasis added).]

The dissent to this order reasoned that it violated the "comprehensive settlement" reached between several interested parties and "seem[ed] to be an end run around [defendants'] commitment in the WSSA to surrender the Pine Project by 2025." *Id*. at P62163-62164 (Glick, C, dissenting). The dissent continued:

> What is surprising is the [FERC's] eagerness to grant that request and potentially upend a decades-long effort to improve resource management in [the] upper Menominee River Basin. I see no reason why we should exercise our equitable discretion to extend the license of the Pine Project by 15 years when doing so would let [WE] out of the spirit of its commitments in the WSSA and adversely affect the public interest considerations that the resource agencies are charged with protecting. And, to add insult to injury, the best the [FERC] has to offer to the

---

[5] This section states:

> In the event that FERC issues final license orders that do not include all of the conditions of this Settlement because FERC has determined that it lacks jurisdiction over those issues, the Parties agree that they will be bound by the conditions of the entire Settlement. With respect to those conditions over which FERC does not have jurisdiction, the Parties agree that the Settlement *shall be enforceable in a court of appropriate jurisdiction*. [Emphasis added.]

resource agencies is a recommendation that they seek relief in court. [*Id*. at P62164.]

Several aggrieved parties sought reconsideration and the FERC reached a split decision before a five-commissioner panel. The lead opinion stated:

Notwithstanding the dissent's assertion that the [FERC] is allowing [WE] to escape the bargain it made in a settlement agreement with other stakeholders regarding the fate of the Pine Project, as we explained in the November 19, 2020 order, *the parties to the settlement retain the ability to seek to enforce the terms of the agreement in court*, as provided for in that document, and [WE] can file an application to surrender its license should it be determined that it is required to do so. [*Wisconsin Electric Power Co*, 2021 FERC 86; 174 FERC 61044, P61179 (emphasis added).]

A concurring commissioner stated:

Given that the [FERC] does not have jurisdiction over the conditions set forth in the agreement, that the conditions are not enforceable by the [FERC], and that there is an apparent dispute as to how to construe the relevant provisions, I am not comfortable concluding that consideration of the [WSSA] should lead us to deny the extension request. [*Id*. at P61180 (Christie, C, concurring).]

The dissent stated:

1. We dissent on today's order because we disagree with the [FERC's] underlying decision to grant a 15-year license extension to [WE] for its Pine Project. . . . That extension effectively overrides a comprehensive settlement between [WE] and numerous federal and state resource agencies and non-governmental organizations—many of which protested this extension request. . . .

2. We do not believe that [WE] has shown that the license extension is in the public interest and would, therefore, grant rehearing to restore the 2025 license expiration date. On February 10, 1997, [WE] reached a comprehensive settlement agreement to protect and improve resource management in the Upper Menominee River Basin with numerous parties, including [USFWS], the [NPS], the [MDNR], the [MDEGLE], the [WDNR], the Michigan Hydro Relicensing Coalition, and the River Alliance of Wisconsin. One of the key provisions in the [WSSA] provides "[WE] agrees to remove the Pine Project upon *the end of the current license term period* provided that the Resource Agencies continue to support removal." Further, the WSSA directs [WE] to initiate consultation in 2020 to affirm or modify the agreement to surrender the Pine Project in 2025.

3. Nevertheless, in this proceeding, [WE] has sought to extend the license of the Pine Project by 15 years, effectively delaying its commitments under the WSSA. Unsurprisingly, numerous federal and state resource agencies objected to the license extension on the grounds that it permitted [WE] to execute an end run around the WSSA. We agree. In granting [WE's] request, the [FERC] allowed [WE] to wiggle out from under its decades-old commitments—negotiated in good

-5-

faith amongst the parties—regarding the Upper Menominee River Basin. [*Id*. at P61179-61180 (Glick & Clements, CC, dissenting).]

## B. STATE COURT ACTION

In response to the FERC order extending the Pine Dam license, the Michigan attorney general filed suit in Ingham Circuit Court in the name of the MDNR seeking enforcement of the WSSA provisions pertaining to the removal of the dam.

## 1. THE COMPLAINT

In the complaint, the MDNR described the negotiation process that culminated in the WSSA and outlined the benefits defendants secured as a result of "the relevant stakeholders voluntarily" coming together to "streamline" the process. The MDNR alleged:

> 16. The [WSSA] is complex enough that section 9.1 of the [WSSA] created the Wilderness Shores Implementation Team (Team) to coordinate and implement the [WSSA]. The Team was to establish bylaws, meet regularly, and serve as the vehicle by which Defendants and state and federal government agencies would make decisions required by the [WSSA]. . . .

> 17. One of the key provisions of the [WSSA] is that Defendant[s] must remove three dams from the basin: the Woods Creek, Sturgeon, and Pine dams. This dam-removal provision was so important that the U.S. Secretary of the Interior personally travelled to the Pine Dam to announce the [WSSA] and celebrate that the Pine Dam "will be removed to bring back free flowing waters." . . .

> \* \* \*

> 19. In accordance with the [WSSA], Defendants removed both the Woods Creek and Sturgeon dams. But Defendants have refused to prepare and submit an application to FERC to remove the Pine Dam.

> 20. According to the [WSSA], Defendants must study different options to remove the dam, work with the Team to select the appropriate removal option, and then submit its removal application to FERC for approval. . . .

After quoting §§ 8.3 and 8.4 of the WSSA and identifying the team members, the MDNR continued:

> 22. . . . Section 8.3 states that Defendants[] must remove the Pine Dam by 2025 if "the Resource Agencies continue to support removal." That section then mandates that "the following process shall be used" to determine whether the resource agencies continue to support removal: "in Year 25 of the current license term (Year 2020), WE will begin consultation with the Resource Agencies for the purpose of affirming or modifying the surrender decision to include the removal decision and/or date of the Pine Project removal."

-6-

23. The year 2020 came and went, and Defendants never did "begin consultation with the Resource Agencies" as required by the [WSSA]. They never called a Team meeting to determine the positions of the Resource Agencies.

24. [M]DNR and the [MDEGLE] sent Defendants a letter on May 5, 2021, explaining that Defendants never called a Team meeting to discuss the Pine Dam. The letter asked Defendants to schedule a Team meeting to determine whether [the] Resource Agencies continue to support removal of the Pine Dam. . . .

25. Defendants scheduled the meeting as requested, and the Team met on June 1, 2021. Representatives of every Resource Agency attended the meeting, and every Resource Agency confirmed that it continued to support removal of the Pine Dam.

26. Defendants acknowledged the Resource Agencies' positions but refused to move to the next step required by section 8.3, which is to develop and submit a surrender application to FERC proposing that the Pine Dam, "be removed at the end of the current license period (Year 2025)."

27. Instead, Defendants have taken the position that because they met alone with one of the Resource Agencies in 2016, the [WDNR], and at that time, Defendants did not believe that the agency supported removal of the Pine Dam, that Defendants are relieved of their obligation to comply with sections 8.3 and 8.4 of the [WSSA].

28. After its private 2016 meeting the [WDNR], Defendants then approached other Resource Agencies and announced that they were no longer required to comply with sections 8.3 and 8.4 of the [WSSA].

29. That position contradicts the [WSSA]. The [WSSA] required Defendants to begin consulting not just with one, but all resource agencies. And Defendants were required to initiate that consultation in 2020, not in 2016. [M]DNR does not consent to Defendants' attempt to unilaterally alter the multi-party [WSSA].

30. Nevertheless, Defendants relied on their incorrect understanding of the [WSSA] to unjustifiably try to lead the Resource Agencies to believe that they were no longer required to prepare and submit an application to FERC to remove the Pine Dam. Defendants then engaged the Resource Agencies in a negotiation on how they could continue operating the Pine Dam until 2040, whether by renewing its FERC license or by applying for a new FERC license. Defendants' approach was misleading because they could not unilaterally alter the [WSSA] and should not have tried to persuade the other parties that submitting an application for the removal of the Pine Dam was no longer required under the [WSSA].

31. In 2019, Defendants requested that FERC extend its license for the Pine Dam to 2040. Every Resource Agency opposed the requested license extension based on their belief that Defendants' actions violated the [WSSA], which required

-7-

the dam's removal by 2025. Defendants initiated the dispute resolution procedures under the [WSSA], relying on FERC's alternative dispute resolution attorney as a third-party mediator. The dispute resolution process was not successful.

32. FERC ultimately agreed to extend Defendants' license for the Pine Dam until 2040 but made explicit that its decision had nothing to do with Defendants' obligations under the [WSSA]. FERC concluded that it did not have jurisdiction to order Defendants to prepare and submit an application for the removal of the Pine Dam. For that reason, FERC concluded [that] nothing about its decision to grant Defendants' extension request to 2040 would preclude Defendants from filing an application to surrender and remove the Pine Dam by 2025 as outlined in the [WSSA] if a court ordered Defendants to do so. *Wisconsin Elec Power Co*, 173 FERC [PP]61162, 61163 (2020).

33. Indeed, section 2.3.4 of the [WSSA] expressly states that for "those conditions over which FERC does not have jurisdiction, the Parties agree that the [WSSA] shall be enforceable in a court of appropriate jurisdiction."

Based on these allegations, the MDNR alleged that defendants breached the WSSA. The parties had reached the agreement after fair and complete negotiations and had complied with the WSSA for more than 20 years, the MDNR alleged, yet defendants then "confirmed that they have no intention of ever preparing a surrender application with the Team let alone submitting that application to FERC for approval to remove the Pine Dam."

39. The parties agreed in the [WSSA] that a court could enforce whichever provisions of the [WSSA] [that] did not fall within FERC's jurisdiction, and FERC has confirmed that it does not have jurisdiction to require Defendants to comply with the [WSSA's] provisions related to submitting a surrender application for the Pine Dam.

40. As a party to the [WSSA], [M]DNR is entitled both as a matter of law and under the terms of the [WSSA] to seek enforcement in this Court.

2. VENUE CHANGE MOTION

In lieu of an answer, defendants moved to change venue to the 41st Circuit Court which covers Menominee, Iron, and Dickinson Counties, and for summary disposition under MCR 2.116(C)(8).

In support of their venue change motion, defendants noted that the dam is not located in Michigan and that their contacts in Michigan were limited to the Upper Peninsula counties where settlement meetings took place. Defendants challenged the MDNR's position that venue was proper in Ingham County because the attorney general had filed the action there:

In its Complaint, [M]DNR alleges that "Ingham County is the correct venue, because this is an action brought by the Attorney General on behalf of the State. MCL 14.102." . . . But that statute only provides that "[a]ny action at law <u>brought by the attorney general in the name of the state or of the people of the state</u>, for the

use and benefit thereof, may be begun in the circuit court in and for the county of Ingham . . . [.]" MCL 14.102 (emphasis added). In this case, the Attorney General has not brought this lawsuit—[M]DNR has. The Attorney General is merely acting as legal counsel to [M]DNR. And the Attorney General's Office representing a party that has brought a lawsuit does not trigger the venue statute upon which the [M]DNR has relied.

The MDNR disagreed with defendants' position that "the Legislature intended there to be a substantive difference between suits in which the attorney general is named personally as a plaintiff and those in which a state agency is the named plaintiff." Rather, historically, and reading various venue statutes together, the MDNR contended that actions by the state may be filed in Ingham Circuit Court.

The court denied the motion to change venue: "[T]he cases are legion on that. The Attorney General has the right to file in Ingham County. It comes up all the time with our cases that might originate in the Upper Peninsula. It's their authority." The court later stated in more detail:

> . . . I've addressed this issue multiple times in the past, often times . . . with [M]DEQ with environmental violations, wetland cases that were at various locations throughout the state, and the action was filed here in Ingham County. I think it went up several times, and it came back and I was affirmed, right.
>
> But here it's the same situation. [MCL] 14.102 says any action brought by the Attorney General in the name of the State. Well, they're bringing it on behalf of the People of the State of Michigan via the [MDNR], all right. I mean, so they are bringing that case.
>
> Or it goes on to say or of the People of the State. So they are the People. That's one of the agencies that regulates affairs on behalf of the People of the State of Michigan. So the Attorney General is the representative, and as such the Attorney General can bring the case in Ingham County. And, I mean, I've ruled that way in the past on other occasions.
>
> . . . [T]his is a direct department of the government, governmental branch. And the Attorney General is representing them. The Attorney General has the discretion as to where to bring the case. It says they can bring it in Ingham County, and they have.

### 3. SUMMARY DISPOSITION MOTION

In support of their summary disposition motion, defendants described that the WSSA provides a "detailed set of procedures for what the parties must do in the event of a dispute concerning the terms and conditions of the WSSA." Specifically:

[T]o resolve such a dispute, Section 9.3[6] of the WSSA first mandates a series of dispute resolution steps: a 90-day period of good-faith negotiation among the members of the [Implementation Team], followed by mandatory pre-suit arbitration or facilitation, and, if those two mechanisms fail, referral by "the Team" to a court or other appropriate authority.

Defendants continued that despite accusing them "of attempting to skirt the WSSA's procedures, dodging its obligations, and hiding the ball to get what it wants," the MDNR "has done exactly that in bringing this lawsuit." Defendants contended that "[o]nly 'the Team' acting *collectively* has the authority to refer a dispute to court" pursuant to § 9.3.2 of the WSSA. Before it could file any suit, the MDNR was required to secure a "consensus" or "a common agreement" between "one representative each from [WDNR], [MDNR], and the [USFWS] or the [NPS], and three representatives from" defendants. "[O]nly the Team . . . can bring a lawsuit involving a dispute over the WSSA. But 'the Team' did not bring this lawsuit; only [MDNR] did, in plain violation of the WSSA." Further, defendants insisted, the complaint did not allege that the team "made any decision as a collective body" before filing suit. Defendants further argued that this defect could not be remedied by adding the other necessary parties; a Michigan court could not summon the WDNR—"an arm of another sovereign state"—or the USFWS or NPS—federal agencies—to appear before it.

Defendants continued that before filing suit, the resource agencies were required to engage in a 90-day period of good-faith settlement negotiations followed by arbitration under § 9.3.1. Although the MDNR alleged that it requested that defendants schedule a team meeting "to determine whether the Resource Agencies continue to support removal of the Pine Dam," that meeting did not involve settlement negotiations or arbitration. Rather, it addressed defendants' obligations under §§ 8.3 and 8.4 of the WSSA. Accordingly, defendants asserted that the MDNR lacked authority to file suit and had violated the WSSA by filing suit without the other parties.

In response to defendants' summary disposition motion, the MDNR challenged defendants' "surprising theory" "that they cannot be sued without their consent." The MDNR noted that it had met all preconditions to filing suit, including initiating the WSSA's negotiation and mediation procedures. The MDNR attached emails to support its position. The MDNR agreed that § 9.3.2 of the WSSA requires "the Team" to refer any dispute to a court for resolution. But

---

[6] This section states:

    In the event that a dispute arises with the terms and conditions of the [WSSA], the Team agrees to engage in good faith negotiations for a period of 90 days unless extended by written agreement of the Team members. The negotiations shall be initiated by either the Chair or the aggrieved voting Team member. In the event that resolution cannot be reached by the Team, it shall engage the services of a third-party arbitrator/facilitator or other agreed upon entity. The Team and facilitator shall agree on the schedule for achieving a resolution under this process. All voting Team members shall share in the cost of the arbitrator/facilitator, with the total cost and distribution agreed upon by the Team prior to initiating the process and defined in the bylaws.

defendants relied on this language to "argue that they can forever bar any suit to enforce the [WSSA]." Defendants made this pronouncement despite that both the majority and the dissent in the FERC "ruled that a party would have to obtain a court order against Defendants to get them to comply with the [WSSA]," and contrary to § 2.3.4 which provides that the WSSA "shall be enforceable in a court of appropriate jurisdiction." Additionally, defendants violated the WSSA themselves. When the negotiations broke down, the team did not unanimously agree to send the dispute to the FERC for resolution; defendants unilaterally sent the dispute to the FERC.

The MDNR further contended that the other resource agencies were not necessary parties to the litigation. The FERC dissent described that all the resource agencies wanted the dam decommissioned and challenged defendants' application extension. Accordingly, the current lawsuit was not contrary to the interests of the other resource agencies. Further, the MDNR contended that it was not trying to cut the other agencies out of the process; rather, the MDNR sought a court order to compel defendants to comply with the WSSA, which would require including everyone at the table. Even if the other resource agencies are necessary parties, dismissal is not the answer, the MDNR continued. Where the other necessary parties are "sovereign entities that are not 'subject to the jurisdiction of the court,' " MCR 2.205(B) permits the action to go forward and "grant appropriate relief." This requires consideration of several factors, all of which supported seeing the action to completion.

The circuit court denied the motion for summary disposition under MCR 2.116(C)(8), determining that there remained questions of fact:

> You've got a contract that says they were supposed to submit for decommission. There's an issue over what that language means. There's an issue on did they have to have the consent of other parties. One side says the Wisconsin equivalent agency does not support decommission. The Attorney General says they do.

> And the Attorney General is saying all we're asking for is to get the application filed because we've already been to the [FERC], and [defendants have not] filed the decommission and the [FERC] said that they didn't have the authority to order that. It had to be done in the court. That's how I summarize it, okay. So basically I'm going to deny the Motion for Summary Disposition. There are too many fact questions out there.

We granted defendants' application for leave to appeal. *Dep't of Natural Resources v Wisconsin Electric Power Co*, unpublished order of the Court of Appeals, entered June 7, 2022 (Docket No. 360932).

## II. VENUE

Defendants continue to contend that venue is not proper in Ingham County. "Venue is controlled by statute in Michigan." *Dimmitt & Owens Fin, Inc v Deloitte & Touche (ISC), LLC*, 481 Mich 618, 624; 752 NW2d 37 (2008). As a general rule, venue in a contract action is governed by MCL 600.1621, which provides for an action to be filed, in relevant part, in "[t]he county in which a defendant resides, has a place of business, or conducts business, or in which the registered

office of a defendant corporation is located[.]" MCL 600.1621(a). However, the Legislature may enact statutes to alter the general rule.

Analysis of this issue requires interpretation of three statutes: MCL 14.29, MCL 14.102, and MCL 600.1631.[7] "[O]ur primary obligation is to discern legislative intent as reflected in the plain language of [these] statutes." *Dimmitt & Owens Fin*, 481 Mich at 624.

MCL 14.29 provides: "It shall be the duty of the attorney general, at the request of the governor, the secretary of state, the treasurer or the auditor general, to prosecute and defend all suits relating to matters connected with their departments." MCL 14.102 states:

> Any action at law brought by the attorney general in the name of the state or of the people of the state, for the use and benefit thereof, may be begun in the circuit court in and for the county of Ingham, and may be prosecuted to final judgment and satisfaction thereof, with like effect as though the cause of action arose in such county. In any such case process issued out of and under the seal of said court may be served anywhere within the state of Michigan.

And MCL 600.1631 provides:

> The county in which the seat of state government is located is a proper county in which to commence and try the following actions:
>
> (a) when the action is commenced by the attorney general in the name of the state or of the people of the state for the use and benefit thereof;
>
> (b) when venue cannot be laid under any other of the venue provisions.

These statutes must be construed together under the doctrine of in pari materia:

> [O]ur courts do not construe individual statutes in a vacuum. Instead, our courts have developed the doctrine of "in pari materia" (literally, "upon the same matter or subject"). Under this doctrine, statutes that relate to the same subject or share a

---

[7] Defendants also cite MCL 14.28, which provides:

> The attorney general shall prosecute and defend all actions in the supreme court, in which the state shall be interested, or a party; he may, in his discretion, designate one of the assistant attorneys general to be known as the solicitor general, who, under his direction, shall have charge of such causes in the supreme court and shall perform such other duties as may be assigned to him; and the attorney general shall also, when requested by the governor, or either branch of the legislature, and may, when in his own judgment the interests of the state require it, intervene in and appear for the people of this state in any other court or tribunal, in any cause or matter, civil or criminal, in which the people of this state may be a party or interested.

common purpose are in pari materia. Such statutes must be read together as one law, even if they contain no reference to one another and were enacted on different dates. . . .

The object of the in pari materia rule is to further legislative intent by finding an harmonious construction of related statutes, so that the statutes work together compatibly to realize that legislative purpose. Therefore, if two statutes lend themselves to a construction that avoids conflict, that construction should control. Two statutes that form a part of one regulatory scheme should be read in pari materia. [*People v Stephan*, 241 Mich App 482, 497-498; 616 NW2d 188 (2000) (quotation marks and citations omitted).]

MCL 14.29 provides that it is "the duty of the attorney general" to represent "the governor, the secretary of state, the treasurer or the auditor general" when requested by those individuals in "suits relating to matters connected with their departments." The governor is the chief executive of our state and 1963 Mich, art V, § 2 refers to the "the office of governor," and not the "department" of governor. The governor, standing alone, is not a department. Many executive branch departments fall under the governor's control, however. "All executive and administrative offices, agencies and instrumentalities of the executive branch of state government and their respective functions, powers and duties . . . shall be allocated by law among and within not more than 20 principal departments." *Id*. As the governor is not a department, MCL 14.29's reference to "their departments" in connection with "the governor" must refer to the departments in the executive branch under the governor's purview. When the attorney general files or defends these suits, the attorney general is not the identified plaintiff or defendant—the executive branch official or department is.

MCL 14.102 falls within the same chapter as MCL 14.29. MCL 14.102 provides that any suit "brought by the attorney general in the name of the state or of the people of the state, for the use and benefit thereof, may be begun" in Ingham Circuit Court. Many cases are filed with the State of Michigan or the People of the State of Michigan as a party. An executive branch department is a part of the state. When the governor asks the attorney general to file suit on behalf of his or her departments, the attorney general is filing suit in the name of the state or on behalf of the people. And the current suit was filed for the use and benefit of the state and the people of the state—to protect our interests in the flow of the Menominee River by requiring defendants to comply with the WSSA. The attorney general may therefore file suit in Ingham County.

Similarly, MCL 600.1631 provides that when the attorney general files suit "in the name of the state or of the people of the state for the use and benefit thereof" that suit may be filed in Ingham County.

Read together, these statutes direct that the attorney general is the attorney for state departments and when the attorney general files suit on behalf of the state or its populace, that suit may be filed in Ingham Circuit Court. This interpretation is supported by *Attorney General v Pub Serv Comm*, 243 Mich App 487, 504; 625 NW2d 16 (2000), in which this Court "acknowledge[d] the unique status of the Attorney General as a constitutional officer of the state of Michigan and her concomitant statutory authority to represent the state as its chief legal counsel."

Further, the Attorney General could have filed this suit against defendants in her own name, giving additional support to the propriety of venue in Ingham County. The attorney general stands in the shoes of the state department under the statutes and could have proceeded as the named plaintiff in the Ingham Circuit Court.[8] In the case of such "misnomer" of party, a complaint may simply be amended without more drastic remedy. As stated in *Miller v Champman Contracting*, 477 Mich 102, 106-107; 730 NW2d 462 (2007), quoting an earlier unpublished opinion of this Court:

> " 'As a general rule, . . . a misnomer of a plaintiff or defendant is amendable unless the amendment is such as to effect an entire change of parties.' " *Parke, Davis & Co v Grand Trunk R Sys*, 207 Mich 388, 391; 174 NW 145 (1919) (citation omitted). The misnomer doctrine applies only to correct inconsequential deficiencies or technicalities in the naming of parties, for example, " '[w]here the right corporation has been sued by the wrong name, and service has been made upon the right party, although by a wrong name . . . .' " *Wells v Detroit News, Inc*, 360 Mich 634, 641; 104 NW2d 767 (1960), quoting *Daly v Blair*, 183 Mich 351, 353; 150 NW 134 (1914); see also *Detroit Independent Sprinkler Co v Plywood Prods Corp*, 311 Mich 226, 232; 18 NW2d 387 (1945) (allowing an amendment to correct the designation of the named plaintiff from "corporation" to "partnership")[,] and *Stever v Brown*, 119 Mich 196; 77 NW 704 (1899) (holding that an amendment to substitute the plaintiffs' full names where their first and middle names had been reduced to initials in the original complaint would have been permissible).

This Court similarly reasoned in *Miszewski v Knauf Constr, Inc*, 138 Mich App 312, 316; 454 NW2d 253 (1990), that "where the amendment of pleadings is done merely to correct a prior error in naming the proper party to the lawsuit, and the defendants have not been denied notice of the action due to this misnomer, the amendments do relate back to the date of the original pleading." Defendants had more than adequate notice of the action and the claims raised. Whether that action be filed in the name of the MDNR or the attorney general, defendants were fully aware of the claims against them.

MCR 2.222(A) permits a venue change upon a party's motion "for the convenience of the parties and witnesses or when an impartial trial cannot be had where the action is pending." MCR 2.223(A)(1) requires a court to transfer venue on its own initiative if the action was filed in an "improper venue." Here, venue was properly placed in the Ingham Circuit Court as the attorney general filed suit on behalf of the state. The circuit court did not clearly err in concluding that venue in Ingham County was no more inconvenient than venue in the Upper Peninsula. See *Dimmitt & Owens Fin*, 481 Mich at 624 ("We review a trial court's ruling in response to a motion to change venue under the 'clearly erroneous' standard."). Accordingly, the circuit court properly denied defendants' motion to change venue.

---

[8] Moreover, the Michigan Department of the Attorney General was a signatory of the WSSA with its own interest in its enforcement. It was not, however, a resource agency.

### III.  SUMMARY DISPOSITION

Defendants continue to contend that they were entitled to summary disposition because MDNR unilaterally filed this suit without the consensus or joining of the other resource agencies and without pursuing presuit negotiations and arbitration.

> We review a trial court's decision on a motion for summary disposition de novo.  A motion under MCR 2.116(C)(8) tests the legal sufficiency of the complaint on the basis of the pleadings alone to determine if the opposing party has stated a claim for which relief can be granted.  We must accept all well-pleaded allegations as true and construe them in the light most favorable to the nonmoving party.  The motion should be granted only if no factual development could possibly justify recovery.  [*Zaher v Miotke*, 300 Mich App 132, 139; 832 NW2d 266 (2013) (quotation marks and citations omitted).]

Resolution of defendants' challenge requires interpretation of the WSSA.  We review de novo issues of contract interpretation.  *Reed v Reed*, 265 Mich App 131, 141; 693 NW2d 825 (2005).  "[T]he main goal in the interpretation of contracts is to honor the intent of the parties." *Mahnick v Bell Co*, 256 Mich App 154, 158-159; 662 NW2d 830 (2003).  This is done by giving the plain and unambiguous words of a contract their plain and ordinary meaning.  *Hastings Mut Ins Co v Safety King, Inc*, 286 Mich App 287, 292; 778 NW2d 275 (2009); *Reicher v SET Enterprises, Inc*, 283 Mich App 657, 664; 770 NW2d 902 (2009).  The words and phrases of the contract cannot be read in isolation, but "must be construed in context and read in light of the contract as a whole." *Auto Owners Ins Co v Seils*, 310 Mich App 132, 148; 871 NW2d 530 (2015) (citations omitted).  "If the contract, although inartfully worded or clumsily arranged, fairly admits of but one interpretation, it is not ambiguous." *Wells Fargo Bank, NA v Cherryland Mall Ltd Partnership (On Remand)*, 300 Mich App 361, 386; 835 NW2d 593 (2013) (quotation marks and citations omitted).

Contrary to defendants' position, the MDNR complaint did state a claim upon which relief could be granted.  MDNR's complaint outlined defendants' duties under WSSA §§ 8.3 and 8.4 to decommission the Pine Dam.  The complaint states that § 8.3 requires defendants to remove the dam "provided that the Resource Agencies continue to support removal."  MDNR alleged that defendants had not taken any of the actions required under those sections.  And MDNR asserted that defendants were not excused from performance.

Specifically, MDNR alleged that defendants did not "begin consultation with the Resource Agencies" in 2020 as required by the WSSA.  Rather, MDNR recited defendants' claim that they met with the WDNR alone in 2016 and that agency stated that it no longer desired removal of the dam. MDNR contended that even if true, that meeting did not eliminate defendants' duty to consult with the other resource agencies.  MDNR asserted that WDNR could have changed its mind between 2016 and the required consultation year of 2020.  Indeed, MDNR stated in the complaint that "[e]very Resource Agency," which included the WDNR "opposed the requested license extension" during the FERC proceedings.

Contrary to defendants' position, MDNR did allege in the complaint that the parties had engaged in the required presuit "good faith negotiations for a period of 90 days" and arbitration.

-15-

The MDNR alleged that defendants had "initiated the dispute resolution procedures under the [WSSA], relying on FERC's alternative dispute resolution attorney as a third-party mediator." Although not the clearest statement, the MDNR also alleged that the parties had engaged in good faith negotiations over a 90-day period:

> 30. Nevertheless, Defendants relied on their incorrect understanding of the [WSSA] to unjustifiably try to lead the Resource Agencies to believe that they were no longer required to prepare and submit an application to FERC to remove the Pine Dam. Defendants then engaged the Resource Agencies in a negotiation on how they could continue operating the Pine Dam until 2040, whether by renewing its FERC license or by applying for a new FERC license. Defendants' approach was misleading because they could not unilaterally alter the [WSSA] and should not have tried to persuade the other parties that submitting an application for the removal of the Pine Dam was no longer required under the [WSSA].

MDNR contended that these processes were ultimately unsuccessful.

The failure of negotiations and arbitration, and FERC's conclusion that it lacked jurisdiction to resolve the questions posed, triggered § 2.3.4 of the WSSA. That section governs court resolution of issues over which the FERC determines it lacks jurisdiction: "With respect to those conditions over which FERC does not have jurisdiction, the Parties agree that the [WSSA] shall be enforceable in a court of appropriate jurisdiction." The MDNR's circuit court complaint was permitted by the plain language of this WSSA provision. The FERC determined that it lacked jurisdiction to interpret and enforce the WSSA. It could not order defendants to file an application to decommission the Pine Dam as required by the WSSA. The parties agreed that under such circumstances, the WSSA "shall be enforceable in a court of appropriate jurisdiction."

Section 9.3.2 of the WSSA provides, "If the independent third party arbitrator/facilitator process is unsuccessful, the Team will refer the dispute to the appropriate authority for resolution." Defendants contend that under this section, each team member must agree to filing the suit. The complaint alleges that each resource agency opposed the FERC license extension. The complaint could easily be amended to add the other resource agencies. See MCR 2.205. See also MCR 2.116(C)(I)(5) ("If the grounds asserted are based on subrule (C)(8), (9), or (10), the court shall give the parties an opportunity to amend their pleadings as provided by MCR 2.118, unless the evidence then before the court shows that amendment would not be justified."). While some of these resource agencies are departments of another state or the federal government, they can be added with their permission.

Defendants denied at oral argument that they posited that their permission was required as team members before a suit could be filed. This is patently untrue. Defendants argued in their motion for summary disposition, "[O]nly the Team—which includes [defendants], [W]DNR, [M]DNR, the [USFWS], and the [NPS] . . .—can bring a lawsuit involving a dispute over the WSSA." They further argued that under the implementation team bylaws, no decision can be made without a "consensus" of the members. Defendants contended that there was no team consensus to file a suit as defendants "certainly did not agree to the filing of this lawsuit." Defendants' gamesmanship runs contrary to the purposes of the WSSA. In an article regarding the negotiation of the WSSA, Melissa Powell described the unique and ground-breaking nature of

this agreement. Powell, 18 Energy LJ at 411. Powell recounted the earlier, complicated processes of securing the necessary licensure for hydroelectric projects and how defendants "reexamine[d] their approach." *Id.* at 412. The interested parties all had a voice, they "met and brainstormed." *Id.* The result was that every side felt satisfied before any action was submitted for licensing. *Id.* at 412-413. Now defendants, who seek to profit the most from the continuation of the Pine Dam, seek to unilaterally enforce their wishes, contravening the spirit and possibly the letter of the settlement.

Ultimately, MDNR alleged that it followed the procedures required in the WSSA and that defendants violated that agreement. Discovery may establish that the MDNR did not abide by the WSSA procedures, or that defendants are entitled to extend their license to operate the dam. But those are questions for a later date.

We affirm.

/s/ Elizabeth L. Gleicher
/s/ Colleen A. O'Brien
/s/ Allie Greenleaf Maldonado