*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ARMADA OIL & GAS COMPANY,

      Plaintiff-Appellant,

v

WARREN PETRO MART, INC., HUSSEIN
MOHAMED, SAMER ALAYAN, MARIAM
BAZZI, ASIL PETRO LLC, HASSAN MOHAMED,
ALY BAZZI, BAZCO OIL COMPANY, BAZCO
ENTERPRISES INC., 23008 DEQUINDRE
PROPERTY LLC, and TELCO INVESTMENTS
LLC,

      Defendants-Appellees.

UNPUBLISHED
August 22, 2024

No. 366043
Wayne Circuit Court
LC No. 20-012322-CB

Before: MARKEY, P.J., and SWARTZLE and MARIANI, JJ.

PER CURIAM.

      This case centers on a product supply agreement (PSA) between plaintiff Armada Oil & Gas Company (Armada) and defendant Warren Petro Mart, Inc. (Warren Petro). Armada sued Warren Petro and a number of other defendants, asserting breach of contract and related tort-based claims. On October 27, 2022, the trial court entered an order granting summary disposition in favor of Armada on one of its breach-of-contract claims against Warren Petro, but limiting Armada's liquidated damages to $2,742.28.[1] The trial court's order otherwise granted summary disposition on Armada's claims in favor of defendants Warren Petro; Hussein Mohamed; Hassan Mohamed; Telco Investment, LLC (Telco); Aly Bazzi; 23008 Dequindre Property, LLC (Dequindre LLC); Bazco Oil Company (Bazco Oil); and Bazco Enterprises, Inc. (Bazco

---

[1] While the trial court's order generally identified this as the amount of liquidated damages, at one point it stated the amount as $2,742.58. For purposes of this opinion, we assume that the trial court intended to award $2,742.28 in liquidated damages.

-1-

Enterprises). Armada appeals by right, challenging the trial court's award of liquidated damages and its grant of summary disposition in favor of defendants.[2] We affirm.

## I. FACTUAL BACKGROUND

Warren Petro is a corporation created by Hussein Mohamed and non-party Hussein Yassine. In 1997, Hussein Mohamed purchased the property at 23008 Dequindre Road (the Dequindre Property), which came to be used for a gas station. In September 2003, Hussein Mohamed and his wife (a non-party) executed a quitclaim deed conveying the Dequindre Property to Warren Petro. Later that year, in October 2003, Warren Petro obtained a commercial loan from Oakland Commerce Bank and, as a result, Oakland Commerce Bank obtained the mortgage to the Dequindre Property.

Armada and Warren Petro entered into the PSA on June 1, 2005. Armada is a wholesale distributor of petroleum products, including gasoline and diesel fuel. Under the PSA, Warren Petro agreed to purchase at least 14.7 million gallons of "petroleum products" from Armada within a period of seven years, and agreed that the term of the PSA would extend if Warren Petro failed to meet the PSA's minimum purchase requirements in any given month or year. The PSA also contained a liquidated-damages provision for failing to meet these purchasing requirements, as well as a right-of-first-refusal provision under which Warren Petro agreed not to "sell, grant an option in respect of, nor, except in the ordinary course or conduct of [Warren Petro's] business, lease or otherwise dispose of" the Dequindre Property without first giving Armada the option "to purchase or otherwise acquire the same on the same terms and conditions as [Warren Petro] is willing to make such disposition to any other party." Both the liquidated-damages provision and the right-of-first-refusal provision are at issue on appeal.

In July 2011, Warren Petro failed to file an annual report as required by law. The record does not make clear whether, as a result of this failure, Warren Petro was automatically dissolved by operation of law at some point, but there is no dispute that, even if such dissolution did occur, it was temporary and Warren Petro later returned to good standing.[3] In August 2011, Bazco Enterprises purchased the loan from Oakland Commerce Bank and assumed the mortgage over the

---

[2] Armada takes its appeal from the final order issued by the trial court on April 19, 2023, which dismissed Armada's claims against defendants Samer Alayan (Alayan) and Asil Petro, LLC (Asil Petro) and closed the case. Alayan and Asil Petro were dismissed by stipulation of the parties and are not parties to this appeal. Mariam Bazzi, who was never served with the complaints, is also not a party to this appeal. Reference to "defendants" in this opinion does not include Alayan, Asil Petro, or Mariam Bazzi.

[3] As set forth in MCL 450.1922(1), automatic dissolution occurs only if the corporation neglects to file an annual report or pay an annual filing fee and the neglect "continues for a period of 2 years from the date on which the [report or fee] was due." The record is unclear as to when exactly Warren Petro came into compliance with its filing requirements and whether there was a two-year period of neglect that would trigger automatic dissolution under MCL 450.1922(1). For the reasons discussed *infra*, however, further clarity on these details is not necessary to properly dispose of Armada's claims.

Dequindre Property. Bazco Enterprises is owned by Aly Bazzi, who also owns Bazco Oil and Dequindre LLC. Relevant to the PSA's right-of-first-refusal provision, around the same time that Bazco Enterprises assumed the mortgage, the Dequindre Property became the subject of several purported transactions. In August 2011, Dequindre LLC entered into a lease agreement whereby it purported to rent the Dequindre Property to Hussein Mohamed and Hussein Yassine as tenants. It is undisputed that this lease agreement was not legally valid because Dequindre LLC did not have any interest in the Dequindre Property. Also in August 2011, Hussein Mohamed and Hussein Yassine, along with their wives, each purported to execute quitclaim deeds transferring the Dequindre Property to Dequindre LLC.

In 2013, Warren Petro defaulted on the mortgage and Bazco Enterprises initiated foreclosure proceedings on the Dequindre Property. On January 25, 2014, Bazco Enterprises purchased the Dequindre Property at a sheriff's sale and obtained a sheriff's deed. When Warren Petro failed to redeem the property, Bazco Enterprises obtained the title to the Dequindre Property. In July 2015, Dequindre LLC purported to execute a quitclaim deed transferring the Dequindre Property to Telco, an entity created in 2015 and owned by Hussein Mohamed's brother, Hassan Mohamed.[4] Like the 2011 lease agreement, the parties do not dispute that this transaction was not legally valid because Dequindre LLC did not have title to the Dequindre Property. In June 2016, however, Bazco Enterprises validly executed a quitclaim deed transferring the Dequindre Property to Telco. The deed was recorded on October 14, 2016. Telco owned the Dequindre Property at all relevant times during the remainder of the proceedings.

Armada continued to supply products under the PSA until August 2020. Although the parties and the trial court offer slightly different numbers, all agree that Warren Petro purchased approximately 13.9 million gallons of gasoline and approximately 700,000 gallons of diesel fuel from Armada under the PSA.

Armada filed suit in September 2020. Relevant here, Armada alleged that Warren Petro breached the PSA's minimum-purchase and right-of-first-refusal provisions and that Armada was entitled to liquidated damages for the former. Armada also brought claims against Bazco Oil, Aly Bazzi, and Hassan Mohamed for tortious interference with a business relationship or expectancy and tortious interference with contracts, alleging that those defendants intentionally and wrongfully induced Warren Petro to terminate its relationship and contract with Armada.

After the close of discovery, the parties participated in an unsuccessful mediation. Shortly thereafter, Armada moved for leave to file a second amended complaint, arguing that during the mediation, it learned, for the first time, of facts regarding the purported transfer of the Dequindre Property. The trial court granted the motion and Armada filed its second amended complaint, which added Dequindre LLC, Bazco Enterprises, and Telco as defendants and added a civil conspiracy claim against all defendants. Armada moved to extend the discovery period based on the new parties and claims, which the trial court denied.

Defendants moved for summary disposition under MCR 2.116(C)(8) and (C)(10). As to Armada's claim that Warren Petro breached the PSA by failing to purchase the required minimum

---

[4] Some corporate documents list Hussein Mohamed as a member of Telco.

-3-

gallons of petroleum products, the trial court granted summary disposition in favor of Armada and ordered Warren Petro to pay $2,742.28 in liquidated damages. In calculating the liquidated damages amount, the trial court found that the phrase "petroleum products" in the PSA included purchases of diesel fuel, rejecting Armada's argument that it included only purchases of gasoline. On all other claims, the trial court granted summary disposition in favor of defendants. The trial court found that Warren Petro did not violate the right-of-first-refusal provision because none of the purported transactions identified by Armada triggered that provision and, because Armada's tort claims were predicated on the alleged breach of the right-of-first-refusal provision, those claims failed as well. This appeal followed.

## II. STANDARD OF REVIEW

"Insofar as [a] motion for summary disposition involves questions regarding the proper interpretation of a contract, this Court's review is de novo." *Duato v Mellon*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 362823); slip op at 3 (quotation marks and citation omitted). This Court also reviews "de novo a trial court's decision on a motion for summary disposition." *Bailey v Antrim Co*, 341 Mich App 411, 421; 990 NW2d 372 (2022), lv den 982 NW2d 175 (2022) (quotation marks and citation omitted). "De novo review means that we review the legal issue independently, without deference to the lower court." *Estate of Swanzy by Swanzy v Kryshak*, 336 Mich App 370, 377; 970 NW2d 407 (2021) (quotation marks and citation omitted).

"A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. . . . Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law." *Maiden v Rozwood*, 461 Mich 109; 119-120; 597 NW2d 817 (1999). "[W]hen reviewing a motion for summary disposition brought under MCR 2.116(C)(10), the court must examine the documentary evidence presented and, drawing all reasonable inferences in favor of the nonmoving party, determine whether a genuine issue of material fact exists." *Dextrom v Wexford Co*, 287 Mich App 406, 430; 789 NW2d 211 (2010). "If the court does determine that a genuine issue of material fact exists, then the motion must be denied and the issues are left to a fact-finder to resolve at a trial." *Id*. A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019).

The trial court did not specify whether it was granting summary disposition to defendants under MCR 2.116(C)(8) or (C)(10). On appeal, Armada argues that the trial court dismissed its claims pursuant to MCR 2.116(C)(8) only. We disagree. The trial court did not rely on the pleadings alone but, instead, considered evidence beyond the pleadings as well. Accordingly, we construe the trial court's order as resolving the motions pursuant to MCR 2.116(C)(10). *Cuddington v United Health Servs, Inc*, 298 Mich App 264, 270; 826 NW2d 519 (2012) (explaining that, "because the trial court considered documentary evidence beyond the pleadings, we construe the motion as having been granted pursuant to MCR 2.116(C)(10)").

## III. LIQUIDATED-DAMAGES PROVISION

Armada argues that the trial court erred by finding that Warren Petro's purchases of diesel fuel fell within the PSA's definition of "petroleum products" and thus erred by including those purchases when calculating the liquidated damages owed to Armada. We disagree.

The main goal of contract interpretation is to enforce the parties' intent. *Burkhardt v Bailey*, 260 Mich App 636, 656; 680 NW2d 453 (2004). This is done by giving the plain and unambiguous words of a contract their plain and ordinary meaning. *Hastings Mut Ins Co v Safety King, Inc*, 286 Mich App 287, 292; 778 NW2d 275 (2009). "An unambiguous contract must be enforced according to its terms," *Burkhardt*, 260 Mich App at 657, and "[c]ourts must not create ambiguity where it does not exist," *Mahnick v Bell Co*, 256 Mich App 154, 159; 662 NW2d 830 (2003). A contract provision is not ambiguous because a word is undefined; rather, a contract's terms must be construed in accordance with their common meaning. *Henderson v State Farm Fire & Cas Co*, 460 Mich 348, 354; 596 NW2d 190 (1999). The words and phrases of the contract cannot be read in isolation, but must be construed in context and read in light of the contract as a whole. *Auto Owners Ins Co v Seils*, 310 Mich App 132, 148; 871 NW2d 530 (2015). "If the contract, although inartfully worded or clumsily arranged, fairly admits of but one interpretation, it is not ambiguous." *Wells Fargo Bank, NA v Cherryland Mall Ltd Partnership (On Remand)*, 300 Mich App 361, 386; 835 NW2d 593 (2013) (quotations marks and citations omitted).

In pertinent part, the PSA states:

1. **TERM.**

The term of this Agreement shall be for a period of seven (7) years or 14,000,000 gallons of gasoline beginning on [June 1, 2005] and ending on [May 31, 2012] (the "Term"). Each consecutive twelve-month period commencing on the [first] day of [June] during the Term of this Agreement shall be referred to as a "Contract Year." . . .

\* \* \*

2. **PRODUCTS AND QUANTITIES.**

2.1 Product and Quantities. Supplier agrees to sell and deliver to Buyer, and Buyer agrees to exclusively purchase and accept delivery from Supplier of BP Amoco petroleum products ("Product(s)"), and other miscellaneous products, which Supplier normally holds out for sale to its customers, as Buyer may order from time-to-time during the Term of this Agreement. During each Contract Year of this Agreement, Buyer agrees to (i) purchase per month from Supplier no less than the Monthly Minimum Gallons as set forth in Schedule A . . . ; and (ii) exclusively sell said Products at its Retail Outlet. Buyer's failure to purchase the said Monthly Minimum Gallons during any relevant month and/or Contract Year as set forth hereinabove shall be grounds for extension of this Agreement.

\* \* \*

4. **IMPROVEMENT MONIES; LIQUIDATED DAMAGES**

\* \* \*

4.2 Liquidated Damages. In the event that Buyer does not purchase an amount of Product equal to the Monthly Minimum Gallons as set forth in Schedule

-5-

A attached hereto in any given month during the Term of this Agreement, the Buyer shall pay to Supplier an amount equal to said Monthly Minimum Gallons less the amount of gallons of Product actually purchased during said month times the amount set forth as Liquidated Damages under Schedule A attached hereto with respect to any said month. Further, in the event that this Agreement is terminated for any reason prior to its expiration, then Buyer shall pay to Supplier an amount equal to the months remaining in the Term times the Monthly Minimum Gallons as set forth in Schedule A attached hereto times the amount stated under Liquidated Damages as set forth in Schedule A attached hereto, which is the parties' reasonable estimate of fair compensation for the foreseeable losses that might result from any said termination. Said amounts payable under this section are to be construed as liquidated damages, and not as a penalty. Payment of any amount owed pursuant to this Section 4.2 shall be made by Buyer to Supplier within thirty (30) days from the date said amount becomes due and owing.

Schedule A states that the "Monthly Minimum Gallons" is 175,000 and that the "Liquidated Damages" amount is two cents "per gallon."

The parties do not dispute that, under the requirements set forth in Section 2.1 of the PSA, Warren Petro was obligated to purchase 14.7 million gallons of "petroleum products." The parties also do not dispute that Warren Petro did not purchase this amount, and thus that Armada was entitled to liquidated damages under Section 4.2 of the PSA. The parties dispute, however, the extent of Warren Petro's shortfall, and thus the extent of liquidated damages owed to Armada. According to Armada, Warren Petro could meet its 14.7-million-gallon obligation only through the purchase of gasoline, and so Warren Petro's purchases of diesel fuel from Armada could not be counted toward that obligation. This, Armada maintains, means that it is entitled to $15,980.46 in liquidated damages, rather than $2,742.28.

Like the trial court, we disagree with Armada's position. The plain and ordinary meaning of "petroleum products," as used in the PSA, includes diesel fuel. Armada does not dispute that diesel fuel is a type of petroleum product. Reading the phrase in context and in light of the PSA as a whole, *Auto Owners Ins Co*, 310 Mich App at 148, we find no support for Armada's argument that the phrase "petroleum products," as used in the PSA, is a term of art limited to only gasoline. The phrase "petroleum products" is plural, indicating that the parties intended for it to include more than one product sold by Armada. And throughout the PSA, where the parties intended to refer to gasoline specifically, they did so. Section 1 states that the term of the PSA shall be for a period of seven years "or 14,000,000 gallons of gasoline." Read in conjunction with the requirement set forth in Section 2.1 that Warren Petro purchase 14.7 million gallons of "petroleum products," its clear that the parties contemplated the phrase "petroleum products" to include more than just gasoline. Likewise, Section 3 states that "Buyer agrees to pay the price set forth in Schedule A . . . for gasolines, fuel oils and diesel fuel." And Section 6.1 of the PSA differentiates the delivery method for "[a]ll gasoline, fuel oil, and diesel fuel" from the delivery method for "[m]otor oils, lubricants, industrial oils, antifreeze and other miscellaneous related merchandise." In other words, where the parties intended to refer to specific petroleum products sold by Armada, they did so. If the parties intended to calculate liquidated damages based only on the number of gallons of gasoline purchased, they would have used the less inclusive word "gasoline" instead of the broader phrase "petroleum products."

Armada's arguments to the contrary are not persuasive. Armada points to the Motor Fuel Tax Act, MCL 207.1001 *et seq*., whose definition of "gasoline" expressly states that "[g]asoline does not include diesel fuel." MCL 207.1003(f). But that statute is not applicable here. The parties did not incorporate the statute's definition of gasoline into the PSA, nor does anything else in the PSA suggest that it provides insight into the parties' intended meaning of "petroleum products." Armada also argues that gasoline and diesel fuel are different and distinct products with different customers, price points and shipping methods. But, as set forth above, the PSA reflects these differences and refers to gasoline and diesel fuel separately where the distinction is relevant to the agreement. Armada fails to show that the differences between the two products have any bearing on the calculation of liquidated damages under the PSA. Accordingly, we affirm the trial court's calculation of liquidated damages.[5]

## IV. RIGHT-OF-FIRST-REFUSAL PROVISION

Armada also argues that the trial erred by finding that Warren Petro did not breach Section 20 of the PSA because no event or transaction occurred which triggered Warren Petro's obligation to provide Armada with an option to acquire the Dequindre Property. Here too, we disagree with Armada and affirm the trial court.

In relevant part, Section 20 of the PSA states:

> Buyer shall not sell, grant an option in respect of, nor, except in the ordinary course or conduct of Buyer's business, lease or otherwise dispose of the Retail Outlet, or any assets or properties used in connection therewith without giving Supplier a sixty (60) day option within which to purchase or otherwise acquire the same on the same terms and conditions as Buyer is willing to make such disposition to any other party.

Armada contends that Section 20 was triggered in July 2011 when Warren Petro was allegedly automatically dissolved by operation of law for failure to file an annual report. Relying on *Pontiac Trust Co v Newell*, 266 Mich 490; 254 NW 178 (1934), Armada argues that Warren Petro's dissolution "necessitated" the transfer of the Dequindre Property to the corporation's stockholders or members. Accordingly, Armada argues, when Warren Petro dissolved in July 2011, title to the Dequindre Property transferred to the corporation's members, Hussein Mohamed and Hussein Yassine, triggering Section 20 of the PSA.

We find no merit in Armada's position. To start, Armada's reliance on *Pontiac Trust* is misguided. The Business Corporation Act, MCL 450.1101 *et seq*., enacted in 1972, governs the dissolution of a corporation. MCL 450.1801(1)(f) provides that a corporation may be dissolved "[a]utomatically, under [MCL 450.1922], for failure to file an annual report or pay the filing fee." But automatic dissolution of a corporation would only occur after that noncompliance persists for

---

[5] Armada does not otherwise challenge the trial court's calculation of liquidated damages.

two years, MCL 450.1922(1),[6] and even then, the dissolution does not automatically divest the corporation of title to its property. MCL 450.1834 states that, "except as otherwise provided by [MCL 450.1833[7]] or court order, a dissolved corporation . . . shall continue to function in the same manner as if dissolution had not occurred" and "[t]itle to the corporation's assets remains in the corporation until transferred by it in the corporate name." And a dissolved corporation may regain its corporate status through subsequent compliance with the filing requirements, at which point "the rights of the corporation shall be the same as though a dissolution or revocation had not taken place, and all contracts entered into and other rights acquired during the interval shall be valid and enforceable." MCL 450.1925. Armada offers, and we see, nothing to support the notion that any temporary dissolution of Warren Petro that may have occurred due to its failure to file an annual report in July 2011 resulted in Warren Petro being divested of its title to the Dequindre Property, let alone in Warren Petro "sell[ing], grant[ing] an option in respect of, . . . leas[ing] or otherwise dispos[ing] of" the Dequindre Property in a manner contemplated by Section 20 of the PSA.

Nor has Armada identified any other transaction that would have triggered that provision. Armada argues that Section 20 was triggered again in August 2011 when Hussein Mohamed and Hussein Yassine both executed quitclaim deeds conveying the Dequindre Property to Dequindre LLC. But Warren Petro was not itself a party to these transactions and, as set forth above, Warren Petro retained title to the Dequindre Property throughout any temporary dissolution, meaning that Hussein Mohamed and Hussein Yassine did not have any interest in the Dequindre Property to convey. See *In re Estate of Burnett*, 341 Mich App 613, 624; 992 NW2d 325 (2022) (explaining that a quitclaim deed "does not warrant valid title and only conveys whatever interest the grantor might have"). Likewise, Warren Petro was not a party to the August 2011 lease agreement between Dequindre LLC and Hussein Mohamed and Hussein Yassine, and Armada does not dispute that the lease agreement was legally invalid because Dequindre LLC never had title to the Dequindre Property. Nor did Bazco Enterprise's assumption of the mortgage in August 2011 trigger Section

---

[6] MCL 450.1922(1), in turn, states:

> If a domestic corporation neglects or refuses to file an annual report or pay an annual filing fee or a penalty added to the fee required by law, and the neglect or refusal continues for a period of 2 years from the date on which the annual report or filing fee was due, the corporation is automatically dissolved 60 days after the expiration of the 2-year period. The administrator shall notify the corporation of the impending dissolution not later than 90 days before the 2-year period expires. Until a corporation is dissolved, it is entitled to issuance by the administrator, on request, of a certificate of good standing setting forth that it is validly incorporated as a domestic corporation and that it is validly in existence under laws of this state.

[7] MCL 450.1833 provides that, "[e]xcept as a court may otherwise direct, a dissolved corporation shall continue its corporate existence but shall not carry on business except for the purpose of winding up its affairs by" performing certain specified tasks.

20 because Warren Petro was not a party to the transaction and the assignment of the mortgage did not transfer title away from Warren Petro.

Warren Petro retained title until 2014 when Bazco Enterprises foreclosed on its mortgage and purchased the Dequindre Property at the ensuing sheriff's sale. Section 20 was not triggered at that time either. The foreclosure and sheriff's sale were involuntary on Warren Petro's part and were effectuated through Bazco Enterprise's exercise of its rights as a mortgagee. This was not the kind of transaction contemplated by the parties when Warren Petro agreed to provide Armada with a sixty-day option "within which to purchase or otherwise acquire the same on the same terms and conditions as [Warren Petro] is willing to make such disposition to any other party." We fail to see how Warren Petro losing its title through foreclosure amounted to it "sell[ing], grant[ing] an option in respect of, . . . leas[ing] or otherwise dispos[ing] of" the Dequindre Property under Section 20 of the PSA, or how Warren Petro could have offered Armada that provision's right of first refusal under such circumstances. Lastly, it is inconsequential, for purposes of determining whether Warren Petro breached the PSA, that Bazco Enterprises later conveyed the Dequindre Property to Telco, because Warren Petro no longer had title to the property at that point and was not a party to the transaction.

In sum, undisputed evidence establishes that Section 20's right-of-first-refusal provision was not triggered under the PSA. Armada failed to establish a genuine issue of material fact on this point, and the trial court correspondingly did not err by granting summary disposition in favor of Warren Petro on Armada's claim that Warren Petro breached Section 20 of the PSA.

## V. TORTIOUS INTERFERENCE AND CIVIL CONSPIRACY CLAIMS

Lastly, and relatedly, we disagree with Armada's position that the trial court erred by dismissing its claims for tortious interference with a contract, tortious interference with a business relationship or expectancy, and civil conspiracy.

As the trial court recognized, these claims are all premised on Armada's theory that defendants took concerted action to transfer title to the Dequindre Property without providing Armada with its contractual right of first refusal under the PSA. But as discussed, Section 20's right-of-first-refusal provision was not triggered or violated by any of the transactions at issue, which in turn means that these other claims necessarily fail as well. Armada disagrees with this conclusion about Section 20, but does not explain how these claims might survive it. See *Seifeddine v Jaber*, 327 Mich App 514, 521; 934 NW2d 64 (2019) (stating that a party "cannot leave it to this Court to make [its] arguments for [it]" and that its "failure to adequately brief the issue constitutes abandonment"). For the same reason, we find no merit in Armada's argument that the trial court erred by not allowing Armada to pursue further discovery into the transactions at issue after filing its second amended complaint, which added the civil conspiracy claim and new defendants. While, generally, a motion for summary disposition is premature if granted before discovery on a disputed issue is complete, granting summary disposition is nevertheless appropriate "if further discovery does not stand a reasonable chance of uncovering factual support for the opposing party's position." *Stringwell v Ann Arbor Pub Sch Dist*, 262 Mich App 709, 714; 686 NW2d 825 (2004). Armada fails to explain how further discovery into the transactions at issue would have been needed or warranted in light of the record already developed and the conclusion above regarding Section 20.

We affirm.  As the prevailing party, defendants may tax costs.  MCR 7.219.


/s/ Jane E. Markey
/s/ Brock A. Swartzle
/s/ Philip P. Mariani